**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| **HARRY SWALES, COREY LILLY, KYLE SHETTLES, and JOHN MCGEE on behalf of themselves and all others similarly situated,** | **Civil Action No.: 3:17-cv-490 DPJ-FKB** |
| **Plaintiffs,** | *Consolidated for discovery with:* |
| **v.** | **Civil Action No.: 3:17-cv-517 DPJ-FKB** |
| **KLLM TRANSPORT SERVICES, LLC, and DOES 1-25** | |
| **Defendants.** | |
| ***CONSOLIDATED FOR PURPOSES OF DISCOVERY WITH:*** | |
| **MARCUS BRENT JOWERS, and others similarly situated** | |
| **Plaintiffs,** | |
| **v.** | |
| **KLLM TRANSPORT SERVICES, LLC** | |
| **Defendant.** | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION</u>**

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................ 1

II.  PERTINENT FACTS AND PROCEDURAL HISTORY ................................. 2

   A.  Procedural History and Discovery ................................................... 2

   B.  Defendant's Corporate Structure and Business Model........................... 3

   C.  The Lease-Operator Business Model ................................................ 6

   D.  Defendant's Treatment of and Control over Lease-Operators ................. 7

   E.  Defendant's Pay Practices............................................................ 14

III.  LEGAL STANDARD .................................................................................. 20

   A.  Conditional Certification Under the FLSA .................................... 20

   B.  The "Similarly Situated" Standard Applicable to Conditional Certification ........... 21

IV.  ARGUMENT ........................................................................................... 22

   A.  Plaintiffs' Collective Should be Conditionally Certified Because Lease-Operators
       Are Uniformly Misclassified by Defendant. ................................. 23

   B.  Plaintiffs' Collective Should be Conditionally Certified Because Defendant's
       Business Model and Practices Cause Putative Collective Members to Be
       Compensated at less than the Minimum Wage........................... 25

V.   CONCLUSION ......................................................................................... 26

## **TABLE OF AUTHORITIES**

**Cases**

*Aguilar v. Complete Landsculpture, Inc.*, 2004 U.S. Dist. LEXIS 20265 (N.D. Tex. 2004) ....... 22

*Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042 (5th Cir. 1987) ................................... 23

*Brown v. Phenix Transp. West Inc.,* 2016 U.S. Dist. LEXIS 90113 (S.D. Miss. 2016) .............. 24

*Burdine v. Covidien, Inc.,* 2011 U.S. Dist. LEXIS 79807 (E.D. Tenn. 2011) ............................ 25

*Carter v. XPO Last Mile, Inc.*, 2016 U.S. Dist. LEXIS 137176 (N.D. Cal. 2016)...................... 25

*Curtis v. Scholarship Storage, Inc.*, 2015 U.S. Dist. LEXIS 33242, (D. Me. 2015) ................... 25

*Grady v. Alpine Auto Recovery LLC*, 2015 U.S. Dist. LEXIS 81989 (D. Colo. 2015) .............. 25

*Harris v. Hinds County, Miss.*, 2014 U.S. Dist. LEXIS 14176 (S.D. Miss. 2014)...................... 21

*Hoffman-LaRoche v. Sperling*, 493 U.S. 165 (1989).................................................... 25

*Hopkins v. Cornerstone Am.,*  545 F.3d 338 (5th Cir. 2008) ....................................... 23

*Huddleston v. John Christner Trucking, LLC*, 2018 U.S. Dist. LEXIS 73149 (N.D. Okla. 2018)

.................................................................................................................... 24

*Prater v. Commerce Equities Management Co.*, 2007 U.S. Dist. LEXIS 85338 (S.D. Tex. 2007)

.................................................................................................................... 21

*Scheidler v. Safeway Rd. Servs.*, 2014 U.S. Dist. LEXIS 52442 (S.D. Tex. 2014) ..................... 24

*Scovil v. FedEx Ground Package Sys., Inc.*, 811 F. Supp. 2d 516 (D. Me. 2011)....................... 24

*Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308 (5th Cir. 1976)........................................ 23

*White v. MPW Indus. Servs.*, 236 F.R.D. 363 (E.D. Tenn. 2006)................................... 1

*Williams v. King Bee Delivery, LLC*, 2017 U.S. Dist. LEXIS 36195 (E.D. Ky. 2017)............... 24

**Statutes**

29 U.S.C. § 202(a) ........................................................................................... 12

29 U.S.C. 216(b) .............................................................................................. 11

## I.    INTRODUCTION

Large trucking companies have for many years used the "lease-operator" or "independent contractor" business model to shift their enormous costs onto the backs of individual drivers. They sell the model hard, with claims drivers can "be their own boss" and "make as much money as they want."  What trucking companies do not disclose is that the "freedom" drivers are handed with the "independent contractor" classification is a farce.  In fact, lease-operator drivers remain as economically dependent on the company as employees. The differences are that the so-called "independent contractors" bear the burden—and risks—of many of the company's business responsibilities, including paying the expenses of truck leases, fuel, insurance, and licensing. Meanwhile, the company maintains exclusive control over the trucks, loads, pricing, and fees. Subsequently, for all their hard work—their weeks-long and even months-long stints on the road and away from their homes—lease-operator drivers are too often paid less than the minimum wage permitted by the Fair Labor Standards Act ("FLSA").[1]

Plaintiffs Corey Lilly, John McGee, Kyle Shettles, and Marcus Brent Jowers ("Plaintiffs"), with support from opt-ins Charles Hallmark, James Johnson, Colton Miller, and Donald Tillman (Opt-ins"), submit this brief seeking conditional certification on behalf of all individual persons and/or entities who entered into Independent Contractor Agreements and Tractor Lease/Purchase Agreements with KLLM Transport Services, LLC ("KLLM") (hereafter referred to as "lease-operators"). Conditional certification is the first step in obtaining justice for KLLM's misclassification of its lease operators and its failure to pay them the minimum wage.

The burden for FLSA conditional certification is fairly lenient. *E.g.*, *Harris v. Hinds County, Miss.*, 2014 U.S. Dist. LEXIS 14176 (S.D. Miss. 2014); discussed *infra,* Sections III.A

---

[1] *See generally,* Declaration of Danielle L. Perry, ¶ 24, Ex. V, Steve Viscelli, Expert Report on the Similarities of KLLM Transport Services Lease-operators and their Relationship to KLLM Transport Services.

and III.B.  Here,  Plaintiffs and Opt-ins  readily satisfy the bar set in the Fifth Circuit for

conditional certification, and Defendant's other lease operators should be promptly notified of

their right to participate in this lawsuit.

## II.   PERTINENT FACTS AND PROCEDURAL HISTORY

### A.  Procedural History and Discovery

Plaintiffs Corey Lilly, Kyle Shettles, and John McGee filed the present action on June 21,

2017, alleging they and Defendant's other lease-operators were misclassified as "independent

contractors" and compensated with less than the minimum wage required by the FLSA. *See*

*generally*, Compl., Dkt. 1; First Am. Compl., Dkt. 11. Plaintiff Marcus Jowers filed a

substantially similar complaint on June 28, 2017. *See generally* Case No. 3:17-cv-517-DPG-

FKP, Dkt. 1. Thereafter, Defendant filed  motions for partial summary judgment in both cases.

Opt-Ins Charles Hallmark, Donald Tillman, and James Johnson filed their consent to join the

lawsuit on December 4, 2017 and December 19, 2017 respectively. *See* Dkt. 20 and Dkt. 23.

Defendant moved to strike the consent of Donald Tillman on the same grounds raised by its

motion for partial summary judgment. Dkt. 22.

In February and March 2018, Plaintiffs prevailed on Defendant's motions for partial

summary judgment, and the parties consolidated both cases filed against Defendant for discovery

purposes. Dkt. 26; Text-Only Order, February 22, 2018; Dkt. 29. In April, the Court granted

Defendant leave to file an amended answer. *See* Text-Only Order, April 19, 2018; First Am.

Answer, Dkt. 33.

In accordance with Federal Rule of Civil Procedure 26(f) the parties conferred and agreed

that discovery in this matter would proceed in phases. *See* Case Management Order, Dkt. 67.

The first phase was to focus on the issue of conditional certification.  Dkt 67. Merits discovery

2

was to proceed in phase two, only after conditional certification and the close of the notice

period. Dkt 67. While the original discovery schedule was pushed back due to scheduling

difficulties with the deposition of Defendant's 30(b)(6) designees and the parties' efforts to meet

and confer regarding supplemental discovery responses, Plaintiff's discovery remained limited to

issues related to conditional certification. Dkt. 67; Dkt. 181; Text Order, November 27, 2018.

Thus far, the parties have each propounded and responded to initial requests for

production and interrogatories. Declaration of Danielle L. Perry ("Perry Decl.") ¶ 10. Plaintiffs

have also propounded requests for admission and related interrogatories and requests for

production, and are meeting and conferring with Defendant regarding additional responses. *Id.*

All Plaintiffs and Opt-Ins have appeared for deposition at the request of Defendant, and Plaintiff

has deposed Defendant's 30(b)(6) designees and one additional employee on various topics

related to conditional certification. *Id.* at ¶¶ 12-22. On November 9, 2018, Defendant moved to

compel Plaintiffs to produce additional damages-related information. Dkt. 166. In the interests of

judicial efficiency, Plaintiffs supplemented their responses on November 30, 2018. Dkt. 185-192.

### B. Defendant's Corporate Structure and Business Model

Defendant KLLM Transportation Services, LLC ("KLLM") is a motor carrier company

whose primary purpose is to provide transportation of refrigerated goods from place to place.

Perry Decl., ¶ 20, Ex. R ("Risinger Dep."), 30:8-24.[2] While the majority of loads dispatched to

KLLM drivers are line-haul refrigerated loads sent over-the-road across the country, KLLM does

have limited regional divisions as well as a few dedicated routes. *Id.* at ¶ 21, Ex. S ("Anthony

Dep."), 29:5-10, 53:7-16. Both company drivers and drivers classified by KLLM as independent

contractors, including those drivers who are part of its Lease Purchase Program, provide the

---

[2] *See* KLLM History webpage at https://www.kllm.com/about/history (last visited Dec. 2, 2018).

same central and integral function to KLLM—driving and delivering goods. *Id.* at ¶ 21, Ex. T ("Beard Dep."), 80:17-24, 95:16-23.

For the majority of the covered period, KLLM's Lease Purchase Program has provided lease operator drivers to all KLLM divisions—Over-the-Road, Regional, and Dedicated. *See* Beard Dep., 19:2-21:7.[3] Under the lease operator model, KLLM's sister company, ITSELM, acquires and holds title to trucks, which it leases to KLLM under a master lease. Beard Dep., 40:22-42:2.[4] KLLM then signs individuals on to its Lease Purchase Program, 95% of whom sublease the ITSELM trucks *from* KLLM according to terms in KLLM's standard Lease Purchase Agreements ("LPAs")—only to lease the same trucks *back to* KLLM under the terms of KLLM's standard Independent Contractor Agreements ("ICAs"). Beard Dep., 22:2-6, 40:22-41:14, Exs. T3, T4; Risinger Dep., 37:8-39:20. Through the ICAs, KLLM retains exclusive use, possession, and control over the lease operators' trucks during the term of the lease, ***effectively preventing lease operators from obtaining loads, or business, from anyone but KLLM***. Risinger Dep., 38:23-39:20; *see also* Beard Dep., Exs. T3, T4. KLLM then deducts the truck lease payments (and other expenses) from its lease operators' income; truck lease payments alone range from approximately $500 to $600 per week. *See* Plaintiff and Opt-in Tractor Lease Purchase Agreements, App. A, at Perry Decl., ¶ 12, Ex. J ("McGee Dep."), Ex. J3; *Id.* at ¶ 13 ("Tillman Dep."), Ex. K2; *Id.* at ¶ 14 ("Shettles Dep."), Ex. L2; *Id.* at ¶ 15 ("Hallmark Dep."), Ex. M2; *Id.* at ¶ 16 ("Jowers Dep."), Ex. N2; *Id.* at ¶ 17 ("Johnson Dep."), Ex. O5; *Id.* at ¶ 18 ("Miller Dep."), Ex. P3; *Id.* at ¶ 19 ("Lilly Dep."), Ex. Q2.

---

[3] KLLM appears to have recently developed an "Express" division, which is only open to company drivers. *See* KLLM New Express Fleet, https://www.kllm.com/transport-services/express-fleet  (last visited Dec. 2, 2018).
[4] Starting in May 2018, all new truck leases for "independent contractor" drivers at KLLM go through its sister company, Equipment Solutions.

In addition to the truck lease payment, KLLM also deducts costs such as satellite fees, bobtail insurance, occupational accident insurance, physical tractor insurance, and satellite communications equipment rental fees each week. Beard Dep., 100:6-14, Ex. T7.  In 2017, these fixed costs were estimated to come to approximately $711 per week—**not** including mandatory contributions to the truck escrow and maintenance fund, cost of actual truck maintenance, or the cost of fuel. Beard Dep., 100:6-14, Ex. T7.

Lease-operators account for approximately 77% of all KLLM drivers and 98% of all KLLM independent contractors. *See* Beard Dep. 17:2-15; Perry Decl., ¶ 11, Ex. I. Over the course of the covered period, KLLM estimates it has had approximately 6,910 drivers classified as independent contractors who operated equipment they leased to KLLM. Perry Decl., ¶ 11, Ex. I. Of those drivers, an estimated 6,758 also leased their truck from KLLM.  *Id*. These estimated 6,758 drivers are the lease-operators at issue in the present motion. All lease-operators drive KLLM-marked trucks and operate under KLLM's motor carrier authority and DOT numbers. Beard Dep., 41:5-14; Risinger Dep., 28:11-29:1; *see also* Jowers Dep., 170:7-13; Lilly Dep., 158:12-22; McGee Dep., 279:10-20; Tillman Dep., 191:5-17; Shettles Dep., 208:10-20.

From a lease-operator's standpoint, there are few differences between the loads they carry. Regardless of whether loads are dispatched as standard over-the-road line-haul loads, on dedicated routes, or specific to a particular region, lease-operators' job duties involve providing truck driving services and equipment for KLLM customers. *See generally,* Perry Decl., ¶ 2, Ex. A, Declaration of Charles Hallmark ("Hallmark Decl."); Perry Decl., ¶ 3, Ex. B, Declaration of James Johnson ("Johnson Decl."); Perry Decl., ¶ 4, Ex. C, Declaration of Marcus Jowers ("Jowers Decl."); Perry Decl., ¶ 5, Ex. D, Declaration of Corey Lilly ("Lilly Decl."); Perry Decl., ¶ 6, Ex. E, Declaration of John McGee ("McGee Decl."); Perry Decl., ¶ 7, Ex. F, Declaration of

Colton Miller ("Miller Decl."); Perry Decl., ¶ 8, Ex. G, Declaration of Kyle Shettles ("Shettles Decl."); Perry Decl., ¶ 9, Ex. H, Declaration of Donald Tillman ("Tillman Decl.") (collectively, "Pl. Decls."). Essentially, dispatchers provide lease-operators with loads to transport from "Point A" to "Point B" within specified time frames, which lease-operators are expected to meet. Anthony Dep., 17:22-18:1. Pl. Decls., ¶¶ 6, 7; *see also* Jowers Dep., 161:2-8; Lilly Dep., 158:3-22; McGee Dep., 281:19-21; Miller Dep., 189:12-14; Tillman Dep., 185:22-186:11.

### C.  The Lease-Operator Business Model

The lease-operator model utilized by KLLM is a common labor management system used by motor carriers. Perry Decl. ¶ 24, Ex. V, Steve Viscelli, *Expert Report on the Similarities of KLLM Transport Services Lease-operators and their Relationship to KLLM  Transport Services, LLC* ("Viscelli Report"), at 7, 12. By this model, major trucking companies are able to shift costs and risks of doing business onto the lease-operators, whom they classify as independent contractors. *Id*. at 13, 16. At the same time, carriers like KLLM maintain disproportionate control over the drivers to guarantee their business needs are met:

> While contractors are promised and nominally retain the right to control the use of their truck, carriers can easily get them to behave like employees because ***they control all immediately available work.***

*Id*. at 15, (emphasis added); *see also* Pl. Decls. ¶¶ 6-10. In fact, if carriers like KLLM allowed their lease-operators to retain significant control in decision making processes (as true independent contractors do), KLLM's operational goals and profitability would likely suffer substantial negative impacts. *Id*. at 7.

Accordingly, KLLM and similar carriers actively manage their lease-operators as if they are employees. *Id.;* Risinger Dep., 28:5-10. The few options or decisions left to the lease-operators—such as routing and where to stop for fuel—are minor, and likely to have only a

marginal impact on lease-operators' net earnings and economic independence. *Id*. Carriers,

including KLLM, hold unilateral control over dispatch of loads—and thereby control their lease-

operator's income. *Id*. at 23. KLLM, for example, offers lease-operators only one load option at a

time, pressures lease-operators to take the offered loads, and punishes lease-operators with wait

time or bad future loads when they exercise their "right" to turn down offered loads. Pl. Decls. ¶¶

8, 9.[5] Moreover, KLLM  lease-operators understand that they are not permitted to drive their

trucks for companies or brokers outside of KLLM without first terminating their relationship

with KLLM and returning their truck. Pl. Decls. at ¶ 5. When asked whether lease-operators use

KLLM trucks to drive on behalf of other companies apart from KLLM, KLLM's Vice President

of Safety answered simply: "he cant drive his truck for another carrier, if he is leased to KLLM."

Risinger Dep., 36:24-37:3, *see also* 37:13-23, 39:17-20.

> Long-haul truck driving is difficult work. It requires many days away from home and
> often doesn't pay well. Carriers promise employees that if they become lease-operators,
> they will have control over their home time and how much money they earn.
> Unfortunately, carriers like KLLM can't deliver on those promises because drivers
> having meaningful control over the work they do - such as being able to pick and choose
> the loads that they haul - is fundamentally at odds with the systematic ways that firms
> maximize efficiency and realize their own goal of maximizing profit.

Viscelli Report at 18-19.

### D.  Defendant's Treatment of and Control over Lease-Operators

Despite the fact that Plaintiffs and Opt-Ins drove for a variety of different KLLM

divisions including over-the-road, regional, and dedicated, they were all governed by

substantially similar policies, practices and procedures. Consistent with the lease-operator model

widely utilized throughout the trucking industry, KLLM utilizes standard form agreements and

---

[5] Documents  produced suggest that sometime in 2017, KLLM made a mobile app load board available to some of its lease operators. The load board however only operates from 12:00 p.m. to 5:00 p.m. CST, Monday through Friday, is restricted to the over-the-road and regional division drivers, and has particular restrictions. Perry Decl. ¶ 25, Ex. W1; *see also* Hallmark Dep., 49:11-51:22.

various policies, practices, and procedures to establish the basis of its employment relationship with its "independent contractor" lease-operators. Beard Dep., 22:2-6, 40:22-41:14, Exs. 3, 4.  Pl. Decls., ¶ 5.

At the start of their employment, KLLM's lease-operators are all required to attend five-day orientation and qualifications where they review KLLM's policies, practices, and procedures and are tested on various skills. Beard Dep., 137:18-138:18; *see* Pl. Decls. ¶ 5; *see* Hallmark Dep., 187:6-12; Lilly Dep., 22:18-23:17; McGee Dep., 66:14-67:1; Tillman Dep., 72:21-73:3. During their orientation all lease operators are required to sign standard Independent Contractor Agreements ("ICAs"), and the approximate 95% of lease operators who lease their truck through KLLM are required to sign standard Tractor Lease/Purchase Agreements ("LPAs"). Beard Dep. 47:13-16, 139:10-23; *see also* Risinger Dep., 41:14-42:9, 44:6-45:24.

ICAs and LPAs set forth terms and conditions governing the relationship between KLLM and putative members of this collective action. *See generally,* Tillman Dep., Exs. K2, K3; Shettles Dep., Exs. L1, L2; Hallmark Dep., Exs. M2, M3. McGee Dep., J2, J3; Jowers Dep., Exs. N2, N3; Johnson Dep., Exs. O5, O6; Miller Dep., Exs. P2, P3; Lilly Dep., Exs. Q2, Q3. While various versions of ICAs and LPAs have been operative during the covered period, the central terms dictating the control that KLLM maintains over each individual lease-operator have not materially changed.  All ICAs produced by Defendant for Plaintiffs and Opt-Ins include provisions nearly identical to the standard from ICA and LPA testified to by KLLM:

- <u>KLLM's Exclusive Possession, Control, and Use of the Truck</u>:  KLLM requires exclusive possession, control, and use of the lease-operator's truck for the duration of the lease. *Compare* Beard Dep., Ex. T3 at subs. G *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3.

- Payment to Lease Operators: During the liability period, payment has been based on either mileage or percent of load, as set forth in detail in App. B of each contract. Since June 2015, all lease operators have been paid based on mileage. Beard Dep., 19:2-15; *Compare* Beard Dep., Ex. T3 at subs. I *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3.

- Operating Expenses: Lease operators are required to cover all operating expenses, including fuel, fuel taxes, licenses, equipment maintenance, highway use taxes, weight taxes, tools and safety equipment, on-board computer and tracing technology that meets KLLM's requirements, and the cost of any property damage to KLLM's trailers. *Compare* Beard Dep., Ex. T3 at subs. J *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3; *see also* Hallmark Dep., 171:18-22; Jowers Dep., 101:5-9; McGee Dep., 89:22-90:12, 90:17-23.

- Insurance: Lease operators are responsible for providing their own non-trucking liability insurance, occupational accident insurance, and physical damage insurance. KLLM requires such insurance to be provided by insurers that are A.M. Best "A"-rated. *Compare* Beard Dep., Ex. T3 at subs. N *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3; *see also,* Jowers Dep., 123:19-124:1

- Required Penalties: Lease operators are responsible for paying a penalty of up to $1,000 of any unreimbursed expense resulting from lease-operator actions. *Compare* Beard Dep., Ex. T3 at subs. O *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3.

- Escrow of Funds:  Lease operators are required to provide KLLM with an escrow of funds in the amount used in the case of lease operator's non-performance of any contract term. Amongst Plaintiffs and Opt-ins the escrow amount ranges from $500 cash of a

$2500 performance bond in the ICA revised 10/28/2009 to $1500 cash or a $2500 performance bond in the ICA revised 2/15/2016. *Compare* Beard Dep., Ex. T3 at subs. Q *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3.

- <u>Use of Carrier Equipment</u>: Lease operators are assessed a charge of 15 cents per mile and a minimum of $50 per day anytime they use their truck to move KLLM's trailer without KLLM's previous authorization. *Compare* Beard Dep., Ex. T3 at subs. R *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3.

- <u>Loads</u>: KLLM has sole discretion in tendering lease-operators individual loads *Compare* Beard Dep., Ex. T3 at subs. 2(B) *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3.

- <u>Termination of Employment</u>: The terms of the ICA automatically renew on an annual basis, unless canceled in writing by any party on 30 days notice. Either party may terminate the relationship with 15 days notice. KLLM reserves the right to terminate the relationship at any time if the lease operator breaches his or her warranty to conduct safe operations in accordance with the FMCSA or "fails to exercise due diligence in the care, custody control of the customer's cargo or carrier's property entrusted to it." *Compare* Beard Dep., Ex. T3 at subs. 7 *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3.

Similarly, while various versions of LPAs have been operative during the covered period, the central terms dictated by KLLM remain the same. For example:

- <u>Maintenance</u>: Lease-operators are required to maintain their truck in accordance with the applicable warranties. *Compare* Beard Dep., Ex. T4 at subs. 2(c) *with* Plaintiffs' LPAs at Exs. J2, K2, L1, M2, N2, O5, P2, and Q2, *see* App. C; *see also* Risinger Dep., 52:5-11;

10

Tillman Dep., 105:2-8. KLLM's LPAs require maintenance in excess of that required by federal regulations—which ensures that lease operators do not defer maintenance to the detriment of KLLM's equipment when they are short on cash. Viscelli Report, at 27.

- Maintenance Escrow: Lease-operators are required to have a maintenance escrow with KLLM. Lease operators are required to pay 11 cents per mile into the maintenances account until the account reaches $10,000, and to maintain a balance of $10,000 in the maintenance escrow. Money in the maintenance account is to be used for "maintenance and repairs, including but not limited to tires, batteries, accessories, preventative maintenance, oil and grease. *Compare* Beard Dep., Ex. T4 at subs. 2(c) *with* Plaintiffs' LPAs at Exs. J2, K2, L1, M2, N2, O5, P2, and Q2; *see also* Hallmark Dep., 185:17-25, 199:5-7; Johnson Dep., 141:11-17; McGee Dep., 95:9-21, 228:1-9; Miller Dep., 181:13-17.

- Alterations to the Truck: Lease-operators are not permitted to add, change, or remove any items that are affixed to their truck without written permission from KLLM. *Compare* Beard Dep., Ex. T4 at subs. 4 *with* Plaintiffs' LPAs at Exs. J2, K2, L1, M2, N2, O5, P2, and Q2; *see also* Johnson Dep., 151:10-23.

- Inspections: KLLM reserves the right to conduct vehicle inspections and mandate maintenance or repairs at any reasonable time or place. The cost of delivering the truck for inspection is to be paid by the lease operator. *Compare* Beard Dep., Ex. T4 at subs. 5 *with* Plaintiffs' LPAs at Exs. J2, K2, L1, M2, N2, O5, P2, and Q2, *see* App. C; *see* McGee Dep., 278:1-18.

- Drivers: Any driver of the leased truck must be pre-approved by KLLM, and meet KLLM's driver qualification requirements. *Compare* Beard Dep., Ex. T4 at subs. 7 *with*

Plaintiffs' LPAs at Exs. J2, K2, L1, M2, N2, O5, P2, and Q2 *See also* Beard Dep., 138:2-18; Risinger Dep., 64:6-22.

- Termination: Upon termination of the lease-operator's employment relationship with KLLM, the LPA terminates automatically. At that time, under the LPA the lease-operator has the option to purchase the truck, but only if the lease operator meets multiple conditions including: (a) compliance with all obligations under the LPA; (b) written notice is provided of intent to purchase within 5 days after termination of the ICA; (c) sale is closed and vehicle is paid for good, sufficient and immediately available finds within 20 days; (d) the lease operator complies with all requirements of the ICA pertaining to return of KLLM placards and property; and (e) at or before the time of purchase, the lease operator has settled all accounts with KLLM. *Compare* Beard Dep., Ex. T4 at subs. 2(b) *with* Plaintiffs' LPAs at Exs. J2, K2, L1, M2, N2, O5, P2, and Q2.[6]

Other policies, practices, and procedures reviewed with all lease-operators at orientation include topics such as: temperature check calls; mandatory ETA policies; accidents and claims procedures; scanning procedures; trailer cleaning and pre-cooling procedures; KLLM's log violation policy; Truck Driver and Cargo Security Procedures; Qual Com policies; and Cell Phone and Electronic Device Policies. Anthony Dep., Ex. 2,[7] 65:16-66:11, 67:14-19, 67:20-

---

[6] The requirement that the lease operator be in compliance with all obligations under the LPA before being able to purchase the vehicle was removed from the standard operating form dated 5/17/2016. As per the 5/17/2016 LPA however, lease-operators were still required to settle all accounts with KKLM before being able to purchase the truck.

[7] KLLM has testified that this document is distributed to all lease operators at orientation. Anthony Dep., 64:23-65:1. Although the language of the document is mandatory, and clearly requires certain procedures to be carried out, KLLM's 30(b)(6) designee repeatedly testified that the procedures are not mandatory, but are instead suggestions, or "best practices." The distinction is a thin one. For example with regard to the requirement that drivers submit their estimated time of arrival at a particular location, Anthony repeatedly states, "in everyday reality, it's not mandatory." When pressed, he clarified "[Y]es, we are asking. We're not mandating." *See generally* Anthony Dep., 64:23-75:1.

68:19; 69:1-116; Beard Dep., 136:19-137:17, 140:3-20, 140:21-141:10, 142:2-21, 143:1-144:11,

144:22-145:22, 148:23-149:11, 149:12-24, Exs. T22, T24, T26, T27, T30, T31.

KLLM's policies and procedures are reinforced throughout the lease-operator's

employment including via their interactions with their dispatchers. Pl. Decls. at ¶ 5.  Dispatchers

supervise transport of the loads for both company and independent contractor drivers. Anthony

Dep., 93:14-25. Though classified by KLLM as "independent," the lease-operators, like

employees, are subject to constant monitoring—via GPS, safety scorecards and grading tools,

and KLLM's safety management program and associated violations counseling.  Beard Dep.,

104:11-16, 109:14-110:4, Exs. 9, 10, 11; Anthony Dep., 26:15-22, 28:1-6; 54:13-22; 57:8-58:3,

88:25-89:2; Jowers Dep., 17:13-18:1.

The purpose of  KLLM's monitoring is two-fold. First, because the DOT holds motor

carriers responsible for all safety violations of their drivers, monitoring helps to ensure that

KLLM's record is not affected by any negative marks earned by a lease-operator. *See* Beard

Dep., 144:22-145:22; *see also* Hallmark Dep., 170:17-171:14. Perhaps even more important to

KLLM's business, monitoring allows KLLM to operate more efficiently in organizing and

transporting loads, and servicing customers. Anthony Dep., 16:17-23, 21:6-16, 28:1-6, 82:21-24;

*See generally,* Viscelli Report. For example, when a dispatcher sees they that a lease-operator is

running late on delivering a load, KKLM can "repower" it, meaning KLLM takes the load from

the lease operator who accepted it and gives it to another driver who is able to deliver it on

time—regardless of whether the original lease operator objects. Anthony Dep., 83:6-10, 83:21-

84:4.

> Q:     And can KLLM order a repower to occur if the independent contractor is running
>         too late?
> A:     Yes.
> Q:     Even if the independent contractor objects to it?

13

A:      Well they agreed to the pick up appointment and delivery appointment when they accepted the load, so, yes, we would repower the load.

Anthony Dep., 83:21-84:4; *see also* Jowers Dep., 159:9-14.

### E.  Defendant's Pay Practices

Lease-operators are out on the road for weeks or even months at a time, often spending days under a single load. Hallmark Dep., 58:14-25; Jowers Dep., 52:3-7; Lilly Dep., 41:25-43:1; Miller Dep., 77:3-11; Risinger Dep., 31:10-14. Plaintiffs testified to the fact that during their time with KLLM they never considered themselves completely off-duty unless they were back at home and no longer carrying a load. *See* Johnson Dep., 131:7-21, 248:3-249:1; 133:2-6, 133:17-135:3; Jowers Dep., 51:12-52:2, 65:17-66:16; Lilly Dep., 91:8-16; McGee Dep., 180:7-19; Tillman Dep., 193:22-194:20. Lease-operators are responsible for the safety and security of both the KLLM freight they haul as well as for the truck and trailer, the entirety of the time they are out on the road.  Hallmark Dep., 60:15-21, 71:1-11; 74:17-23; Johnson Dep., 248:3-249:1; McGee Dep., 180:7-19, 189:18-22; Miller Dep., 68:18-69:9, 83:5-25, 98:9-24. Despite the 24/7 on-duty nature of their jobs, Plaintiffs, Opt-Ins, and other lease-operators never agreed not to be paid for meals or sleep times when they were working for KLLM.  Pl. Decls. at ¶ 12.

Since approximately June 2015, all KLLM lease operators have been provided mileage based compensation. Beard Dep., 18:15-21:7; Risinger Dep., 24:17-21.[8] All compensation terms are described by App. B of the ICAs. *Compare* Beard Dep., Ex. T3 at subs. O *with* Plaintiffs' ICAs at Exs. J3, K3, L2, M3, N3, O6, P3, and Q3. Such compensation is intended to "constitute the total compensation for all everything furnished, provided or done" by the lease operator in connection with the Independent Contractor Agreement. *See* Standard and Plaintiff ICAs at Perry

---

[8] Prior to June 2015, drivers classified by KLLM as independent contractors who drove a regional route were paid on a percent-of-load basis. Beard Dep., 19:2-15.

Decl., Exs. T3, J3, K3, L2, M3, N3, O6, P3, and Q3. Pls.' Decls., ¶ 12; *see also* Risinger Dep., 31:18-32:24.

Particular rates applicable to drivers can be found in App. B to the ICAs, as well as by reviewing weekly settlements distributed to all lease-operators. Beard Dep., 151:5-15; *see* Standard and Plaintiff ICAs at Perry Decl., Exs. T3, J3, K3, L2, M3, N3, O6, P3, and Q3; *See* Plaintiff Settlements at Perry Decl., ¶ 23, Exs. U1-U8 ("Pl. Settlements"). The weekly settlements also evidence any additional payments made to lease-operators and the substantial deductions made for items such as lease payments, fuel, insurance, and licenses. *Id*.

KLLM's common pay policies caused lease-operators to be paid less than $7.25 per hour for hours worked.  The FLSA regards all time a driver spends out on the road to be time dedicated to his or her employer's interest as work. 29 C.F.R. §785.22.  Lease-operators typically out on the road for KLLM 24 hours per day, 7 days per week.  KLLM failed to compensate lease operators at least the minimum wage for these hours. For example, for the week ending in June, 9, 2016, Shettles' settlement sheet shows he drove a total of 1,504 miles and, after deductions for costs such as his truck lease and fuel expenses, *owed* KLLM $84.97.  Pl. Settlements, Ex. U-7. Even if you take into account the $303 advance he received during that week, Shettles made *far* less than $7.25 per hour.  *See id.* During the week preceding June 9, 2016, McGee drove a total of 2,021 miles and, after deductions for costs such as his truck lease and fuel expenses,  was compensated with only $136.74.  Pl. Settlements, Ex . U-5; *see generally,* Pl. Settlements. KLLM has no policy or practice for ensuring lease operators are compensated at least the hourly minimum wage required under the FLSA:

> Q:    Do you know of any term in any of KLLM's policies that guarantees drivers
>        classified as independent contractors at least the minimum wage under the FLSA?
> A:    No.  That would not apply to a contractor.

Q:     Do you know of any KLLM policy that guarantees drivers classified as
       independent contractors at least $7.25 per hour worked?
A:     No.  Again, that would not apply to an independent contractor.
Q:     Does KLLM have any policy, practice or procedure to check to even see whether
       drivers classified as independent contractors are paid at least $7.25 per hour?
A:     No.

Beard Dep., 150:19-151:9.

### F.  Common Experience Across Plaintiffs and Opt-Ins

All Plaintiffs and Opt-ins in this matter were subject to near identical policies, practices

and procedures, and came away from KLLM with similar experiences. All Plaintiffs and Opt-ins

were drivers for KLLM through its Lease Purchase program. Pl. Decls. at ¶¶ 1-3. All Plaintiffs

and Opt-Ins were required to go through KLLM's orientation, and each and every one leased a

truck from KLLM. Pl. Decls. at ¶¶ 3, 5; Johnson Dep., 135:17-136:3. Upon termination of their

employment relationship with KLLM, all of the Plaintiffs or Opt-ins turned in their trucks back

to KLLM—they did not know of or did not have any other viable option. Hallmark Dep.,

197:15-22; Johnson Dep., 91:14-92:5, McGee Dep., 84:1-85:1, 89:16-21, 282:6-18; Miller Dep.,

171:16-172:23, 190:23-191:14; Tillman Dep., 104:2-11; Shettles Dep., 103:19-104:7. Lease-

operators were not permitted to continue their KLLM truck lease while driving for another

trucking company; it was explained that if they ever wanted to leave, they were to "turn their

keys back in[.]"  *See* Standard and Plaintiff Tractor Lease Purchase Agreements, Perry Decl.

Exs. T4, J2, K2, L1, M2, N2, O5, P2, and Q2; Shettles Dep., 103:19-104:7, 209:15-24; *see also*

Tillman Dep., 188:1-21.

There are only some slight differences across the group of Plaintiffs and Opt-ins.

Plaintiffs and Opt-ins drove for various divisions of KLLM. Shettles, McGee, Jowers, and

Tillman drove for KLLM's over-the-road division, while Johnson was a regional driver in the

southeast and Lilly was on a dedicated route. Johnson Dep., 99:13-22; Lilly Dep., 37:21-25.

16

Hallmark and Miller both started their KLLM careers over-the-road. Hallmark Dep., 39:2-17; Miller Dep., 53:19-54:4. Hallmark switched to a dedicated route, while Miller went to the southeast region before being pushed back into over-the-road. Hallmark Dep., 39:2-17; Miller Dep., 53:19-54:4. Of all the Plaintiffs, only Miller and Johnson were ever paid by percent of load, and only when they were with the southeast regional, and then only until the percent of load pay was phased out by KLLM in June 2015. Beard Dep., 19:2-15.

Yet even across the different divisions, all lease operators have thus far testified to substantially similar common experiences with KLLM. Each one functioned as a truck driver, picking up and delivering loads at times specified by KLLM's dispatchers. Pl. Decls. at ¶¶ 6, 7; *see also* Lilly Decl., 158:3-8; McGee Dep., 281:19-21. Each was required to make substantial weekly lease payments for the use of a truck, which were deducted from their wages. Plaintiff Decls. at ¶ 3; *see also* Pl. Settlements. They were all responsible for covering operating costs including fuel, insurance, licensing fees, and maintenance. Pl. Decls. at ¶ 4;  Hallmark Dep., 95:14-15; Jowers Dep., 101:5-9, 105:13-19

Perhaps more importantly, they all felt the pressure of the economic parameters and controls placed on them by KLLM. For example, each and every Plaintiff and Opt-in understood that they were not permitted to drive loads for any entity other than KLLM. Pl. Decls. at ¶ 10; Hallmark Dep., 88:5-15, 198:5-198:1; Tillman Dep., 195:25-196:5; Shettles Dep., 208:21-25. At his deposition Johnson testified:

> Q:   I'm trying to make sure I'm understanding your answer.  Are you saying you could not go out and haul freight for other trucking companies, or you could not go out and haul freight for other people who had goods they wanted to move somewhere?
> A:   It's the same thing.  Like if it wasn't—it wasn't KLLM-related, I couldn't do it. So it had to be their freight.
> Q:   Uh-huh.  Could you go to other trucking companies and ask to haul their freight while you were at KLLM?

> A:    I could have did it, but no. No.
> Q:    What do you mean you could have done it?
> A:    I was just saying basically I can do anything really, but was it right? Would I be
>        fired? Yes, I would be fired.
> Q:    And who told you that?
> A:    KLLM.
> Q:    When?
> A:    At orientation.

Johnson Dep., 85:23-87:70. Miller testified he was told that he would not be able to carry loads

for anyone outside of KLLM, and that he did not ever know of any KLLM lease-operator who

hauled loads for a carrier other than KLLM. Miller Dep., 64:3-9, 189:15-17. McGee testified

similarly.

> Q:    Who was it you understood you could not call to obtain loads?
> A:    It was my understanding that I couldn't use KLLM's equipment to haul another
>        company's freight.

McGee Dep., 125:19-23.

Although most acknowledged that they were not technically under "forced dispatch" per

the terms of the ICA,  each and every Plaintiff and Opt-in felt pressure to take the loads provided

by their KLLM dispatchers, as if they were in fact under forced dispatch. Pl. Decls. at ¶ 9;

Hallmark Dep., 42:18-43:7, 44:10-25, 45:5-18; 141:13-142:12; 144:15-145:3, 206:22-207:21;

201:15-211:2; Johnson Dep., 54:23-55:10, 55:19-56:1, 57:6-22, 251:17-20; Lilly Dep., 55:25-

56:11, 57:17-58:14, 60:17-61:7; McGee Dep., 120:25-121:13; 164:6-10; 280:3-281:10; Miller

Dep., 45:13-18; Tillman Dep., 128:25-129:6. All Plaintiffs and Opt-Ins knew they would be

punished with wait time or worse loads if they refused what was initially offered. *See, id*. Lease-

operators on dedicated routes were required to be on forced dispatch. Hallmark Dep., 120:6-14;

Lilly Dep., 37:21-38:8. KLLM itself even testified to some of the consequences of refusing

loads, including lowered driver scorecard grades, and removal from dedicated fleets.  Anthony

Dep., 57:8-58:3, 59:18-60:2. KLLM would even threaten to mark drivers down as having

abandoned a load that the driver had not picked up in order to get the driver to comply and pick up the load. Jowers Decl., ¶ 9.

Even where lease operators did decide to refuse a load, they had to do so without access to, or the ability to participate in, the open market—they had to make the decision to accept or refuse the single load KLLM offered without knowing what other options KLLM may or may not make available to them. Anthony Dep., 82:12-83:1; Johnson Dep., 45:14-21, 217:16-218:4; McGee Dep., 136:19-24; Miller Dep., 46:2-15, 47:10-23; Shettles Dep., 53:15-54:11, 152:20-153:3.[9] Lease-operators did not have the power to negotiate the amount they were paid per mile for particular loads, and certainly did not negotiate the prices paid by shippers or receivers. Hallmark Dep., 199:21-23; Lilly Dep., 158:9-11; Johnson Dep., 249:2-5; McGee Dep., 282:19-283:3; Tillman Dep., 196:13-23. Indeed, the fact that Plaintiffs and Opt-Ins could not haul loads for anyone other than KLLM, and KLLM's refusal to offer more than one load at a time, often meant that the decision to refuse a load amounted to a decision to forgo income for an unknown period of time. Pl. Decls., ¶ 9. In reality, this meant no decision at all as lease payments, insurance, and other bills did not stop while a driver was waiting for a load.

Regardless of the choices they could make between the limited options presented to them by KLLM, lease-operators remained economically dependent on KLLM. *See* Pl. Decls, ¶ 10. Tillman testified that despite his ability to choose his own route and fuel stops, he remained economically dependent on KLLM because KLLM was the only entity that could provide him with loads. Tillman Dep., 191:18-192:16. McGee testified similarly regarding his economic dependence:

---

[9] *But see* after 2017, Opt-in Hallmark had limited access to a KLLM-operated load board.  Hallmark Dep., 49:11-51:22.

> Q:      We also talked about how you learned to get more efficient over the course of
>         your employment with KLLM.  Did becoming more efficient make you any less
>         economically dependent on KLLM?
> A:      No, it just made my job easier.

McGee Dep., 283:24-284:3; *see also* McGee Dep., 296:10-16, 297:6-12; *see also* Shettles Dep.,

211:12-212:3; Johnson Dep., 251:9-16. KLLM's lease-operators are were operating their own

business, but were dependent upon KLLM for their income, and were regularly compensated at

rates below the FLSA mandated minimum wage. *Id.*; Viscelli Report at 32; *see for example* Pl.

Settlements.

        In short, the options allowed to the lease operators were not ones that enabled them to

establish or assert any sort of economic independence from KLLM. *See* Viscelli Report. When

questioned about his dependence on KLLM at deposition Jowers testified simply, "I couldn't

have done it without [KLLM] at all." Jowers Dep., 160:5-22.

## III.   LEGAL STANDARD

### A.  Conditional Certification Under the FLSA

        Under the FLSA, employees can sue on their own behalf and on behalf of "similarly

situated" persons. 29 U.S.C. 216(b).[10] FLSA collective actions are fundamentally different than

Rule 23 class actions in that they proceed on behalf of individuals who have "opted-in" to the

lawsuit, as opposed to proceeding on behalf of everyone who has not opted out. *LaChapelle v.*

*Owens-Illinois, Inc.,* 513 F.2d 286 (5th Cir. 1975); 29 U.S.C. 216(b). Accordingly, courts in the

5th Circuit favor the "typical" manner in which collective actions proceed—namely, the two-step

approach for certification known as the *Lusardi* approach. *Sandoz v. Cingular Wireless LLC,* 553

F.3d 913, 915 (5th Cir. 2008); *Harris v. Hinds County, Miss.,* 2014 U.S. Dist. LEXIS 14176

---

[10] Plaintiffs allege that they and KLLM's other lease-operators were misclassified as "independent contractors," are
in fact employees, and are thus owed the minimum wage under the FLSA. *See generally* Compl., Dkt. 1, First Am.
Compl., Dkt. 11.

(S.D. Miss. 2014); *see also Tolentino v. C & J Spec-Rent Servs*., 716 F. Supp. 2d 642, 656 (S.D. Tex. 2010). The first step of the *Lusardi* approach is the "notice stage" during which the court makes a decision whether notice should be provided to potential collective members informing them of the suit and allowing them to "opt-in." *Id* at 656. This determination is made using a fairly lenient standard and typically results in conditional certification of a representative class. *Id*. It is only at the second and later stage, coming after collective members have been given an opportunity to opt-in to the case and discovery has closed, that the Court makes a factual determination as to whether class members are similarly situated. *Harris*, 2014 U.S. Dist. LEXIS 14176, at *2.

Congress passed the FLSA with broad remedial intent to eliminate, as rapidly as practicable, substandard labor conditions throughout the United States and to establish labor standards necessary to maintain the "minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. 202(a); *see also Cash v. Conn Appliances*, 2 F. Supp. 2d 884, 890 (E.D. Tex. 1997); *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 508 (1950). Courts have long held that "in light of its humanitarian intent, the Act's coverage should be construed liberally." *Cleveland v. City of Elmendorf*, 2004 U.S. Dist. LEXIS 925, *15 (W.D. Tex. 2004) *citing Rodriguez v. Township of Holiday Lakes*, 866 F. Supp. 1012, 1017 (S.D. Tex. 1994).

### B.  The "Similarly Situated" Standard Applicable to Conditional Certification

At the present and initial stage of conditional certification, to demonstrate notice should be provided to potential class members plaintiffs must make only a "modest factual showing" that the named Plaintiffs and putative opt-ins were victims of a common policy or plan that

violated the law. *Harris*, 2014 U.S. Dist. LEXIS 14176 at *2. Under this fairly lenient standard, a

plaintiff must make only a minimal showing that:

> (1) there is a reasonable basis for crediting assertions that aggrieved individuals exist, (2) that those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted, and (3) that those individuals want to opt in to the lawsuit.

*Harris*, 2014 U.S. Dist. LEXIS 14176 at *2 (quoting *Prater v. Commerce Equities Mgmt. Co.*,

2007 U.S. Dist. LEXIS 85338, *4 (S.D. Tex. 2007)). A class of plaintiffs can be conditionally

certified for notice despite some level of heterogeneity. *Id*. A plaintiff need only show his

position is similar, not identical, to that of potential collective members with respect to job

requirements and pay provisions. *Id* at *2 (citing *Aguilar v. Complete Landsculpture, Inc.*, 2004

U.S. Dist. LEXIS 20265, (N.D. Tex. 2004).

## IV.    ARGUMENT

Plaintiffs have met the Fifth Circuit's standard for conditional certification by

demonstrating that they and Defendant's other lease-operators were subject to Defendant's

policy and practice of misclassifying its lease-operators as independent contractors and failing to

pay them at least the minimum wage for all hours worked.

Plaintiffs and other lease operators are similarly situated in that they have received the

same training, are subject to the same policies, practices, and procedures, are assigned work in

the same manner, and have their weekly take-home compensation calculated in the same way.

When making a determination on the merits after conditional certification and completion of

discovery, an examination of the application of KLLM's uniform business practices will

demonstrate that the lease operators were misclassified by Defendant as independent contractors,

that they are actually employees, and that each driver is owed back wages to increase their

hourly compensation to at least the minimum wage required under the FLSA.

Although it is not necessary at this point in time to address issues of damages, Plaintiffs have put forward evidence supporting their prima facie allegation that they were compensated at less than the minimum wage. *See* Pl. Settlements. They have also set forth sufficient facts to demonstrate that all putative collective members were subject to a substantially similar compensation policies which result in compensation at less than the minimum wages under the FLSA.

### A. Plaintiffs' Collective Should be Conditionally Certified Because Lease-Operators Are Uniformly Misclassified by Defendant.

Fifth Circuit courts have found that the determination of whether an employee has been misclassified as an independent contractor is a question of his or her "economic reality." Neither contractual recitations nor subjective intent can mandate a finding of independent contractor status. *Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1315 (5th Cir. 1976). Instead, the relevant inquiry is ***"whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."*** *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 343 (5th Cir. 2008) (emphasis added, internal quotations omitted). In making that determination, the Court should consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Hopkins*, 545 F.3d at 343. No factor is sufficient or dispositive in and of itself; instead each should be considered in the larger context of the ultimate inquiry. *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043-44 (5th Cir. 1987).

Plaintiffs and Opt-ins have presented sufficient evidence to provide a reasonable basis for the assertion that they, and other lease operators, were misclassified by KLLM. They have

provided evidence demonstrating that KLLM controlled important aspects of their job—such as loads available to them and the price paid per load—which limited their opportunity for profit and ensured their economic dependence. They have demonstrated the limited nature of their investments—they invested no money up front and only made lease payments made for a truck that had to be turned back in to KLLM when they left the company. And they have demonstrated the relative permanence of their position by signing on to multi-year leases, most driving multiple loads per week exclusively for KLLM, for months and months at a time. Essentially, they have shown that KLLM misclassifies them as independent contractors, shifts the burden of doing business onto the individual lease operators, and has compensated them at less than the minimum wage.

More importantly at this stage of litigation, Plaintiffs and Opt-ins have shown that the economic realities test is subject to common proof across the alleged collective. While an assessment on the merits is not appropriate until after conditional certification, when all lease operators have had the opportunity to opt-in to the suit and both parties have had the chance to complete discovery, KLLM's standard form ICAs and LPAs alone demonstrate that Plaintiffs, Opt-ins, and other members of the putative collective were similarly situated as to each of the prongs of the economic realities test. As such, conditional certification should be granted.

Courts regularly grant conditional certification of cases in which a plaintiff alleges he or she was misclassified as an independent contractor and owed wages under the FLSA. *See Scheidler v. Safeway Rd. Servs.*, 2014 U.S. Dist. LEXIS 52442 (S.D. Tex. 2014) (conditionally certifying a class of tow truck drivers alleging they were misclassified as independent contractors and owed wages under the FLSA); *Brown v. Phenix Transp. West Inc.,* 2016 U.S. Dist. LEXIS 90113 (S.D. Miss. 2016) (granting conditional certification of a collective of <u>both</u> independent

contractor and employee over-the-road truck drivers); *Huddleston v. John Christner Trucking, LLC*, 2018 U.S. Dist. LEXIS 73149 (N.D. Okla. 2018) (conditionally certifying a collective of lease-operators allegedly misclassified as independent contractors); *Williams v. King Bee Delivery, LLC*, 2017 U.S. Dist. LEXIS 36195 (E.D. Ky. 2017) (conditionally certifying a group of delivery drivers allegedly misclassified as independent contractors); *Scovil v. FedEx Ground Package Sys., Inc.*, 811 F. Supp. 2d 516 (D. Me. 2011) (granting conditional certification of drivers alleging they were misclassified as independent contractors); *Curtis v. Scholarship Storage, Inc.*, 2015 U.S. Dist. LEXIS 33242, (D. Me. 2015) (granting conditional certification to shuttle drivers allegedly misclassified as independent contractors, subject to the same unlawful payroll deductions); *Carter v. XPO Last Mile, Inc.*, 2016 U.S. Dist. LEXIS 137176 (N.D. Cal. 2016) (granting conditional certification of a class of delivery drivers allegedly misclassified as independent contractors); *Grady v. Alpine Auto Recovery LLC*, 2015 U.S. Dist. LEXIS 81989 (D. Colo. 2015) (granting conditional certification to a group of tow truck drivers allegedly misclassified as independent contractors). This court should grant certification of the similar collective alleged in this matter.

**B.  Plaintiffs' Collective Should be Conditionally Certified Because Defendant's Business Model and Practices Cause Putative Collective Members to Be Compensated at less than the Minimum Wage.**

The U.S. Supreme Court has made clear that when *allegedly* unlawful conduct affects multiple employees, the FLSA does not 'relieve employers of the burden of multiparty actions,' but instead allows plaintiffs to pool their resources by litigating factually similar claims at once. *Hoffman-LaRoche v. Sperling*, 493 U.S. 165, 170-173 (1989); *see also Burdine v. Covidien, Inc.*, 2011 U.S. Dist. LEXIS 79807 (E.D. Tenn. 2011). Here, Plaintiffs have alleged KLLM's uniform control over rates, control over the loads, strict requirements to adhere to its own policies, and its

common policy and practice of shifting operating expenses to its individual lease-operators cause its lease-operators to be paid less than the required minimum wage under the FLSA. As such, under *Hoffman,* Plaintiffs and other lease-operators should be permitted to pool their resources and litigate their factually similar claims together.

Plaintiffs and Opt-ins have shown that over the course of the covered period, KLLM has provided primarily mileage-based compensation for its lease-operators that is expected to cover all activities done or undertaken in furtherance of their job duties. The common compensation schemes are laid out in Appendices B to the ICAs and are evidenced by all lease-operators' weekly settlements statements throughout the course of their employment relationship with KLLM. The ICAs, LPAs, settlement statements, and lease-operator declarations demonstrate KLLM's policy and practice of compensating all lease-operators with a substantially similar compensation plan.  The ICAs, LPAs, settlement statements, and lease-operator declarations also demonstrate KLLM's policy and practice of making similar deductions from all lease-operator's settlements for operating expenses such as lease payments, fuel, insurance, licenses. While exact payments and deductions will certainly have some variation week by week, the analysis applied to all lease-operator wages will be identical and involve common proof.

## V.    CONCLUSION

For all the aforementioned reasons, this Court should grant Plaintiffs' Motion for Conditional Certification and allow notice to be provided to putative members of the collective.

Respectfully Submitted,

Dated: December 7, 2018                */s/ Danielle L. Perry*
                                       Gary E. Mason (admitted *pro hac vice*)
                                       Danielle L. Perry (admitted *pro hac vice*)
                                       WHITFIELD BRYSON & MASON, LLP
                                       5101 Wisconsin Ave NW, Ste. 305

Washington, D.C. 20016
Tel: 202-429-2290
Fax: 202-429-2294
Email: gmason@wbmllp.com
Email: dperry@wbmllp.com

Michael Aschenbrener (admitted *pro hac vice*)
KAMBERLAW LLC
201 Milwaukee St, Suite 200
Denver, CO 80206
Tel: (212) 920-3072
masch@kamberlaw.com

J.  Dudley Butler
Butler Farm and Ranch Law Group PLLC
499A Breakwater Drive
Benton, MS 39039
Tel: (662) 673-0091
jdb@farmandranchlaw.com

*Counsel for Plaintiffs Corey Lilly et al.*

Joshua H. Haffner (admitted *pro hac vice*)
Graham G. Lambert (admitted *pro hac vice*)
Haffner Law PC
445 S. Figueroa Street, Suite 2325
Los Angeles, CA 90071
Tel: (213) 514-5681
Fax: (213) 514-5682
jhh@haffnerlawyers.com
gl@haffnerlawyers.com

J. Brad Pigott, Miss. Bar No. 4350
Pigott Law Firm
775 N. Congress St., MS 39202-3009
Tel: (601) 354-2121
Fax: (601) 354-7854
bpigott@pjlawyers.com

*Counsel for Plaintiff Marcus Brent Jowers*

**<u>CERTIFICATE OF SERVICE</u>**

On December 7, 2018, I served the foregoing documents described as: MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION on interested parties through ECF's document filing system.


*/s/ Danielle L. Perry*
Danielle L. Perry