UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

HARRY SWALES, COREY LILLY,
KYLE SHETTLES, and JOHN MCGEE
ON BEHALF OF THEMSELVES
AND ALL OTHERS SIMILARY SITUATED                            PLAINTIFFS

VS.                                    CIVIL ACTION NO.3:17cv490DPJ-FKB

KLLM TRANSPORT SERVICES, LLC
and DOES 1-25                                               DEFENDANTS

*Consolidated for purposes of discovery with:*

MARCUS BRENT JOWERS, AND                                    PLAINTIFFS
OTHERS SIMILARLY SITUATED

VS.                                    CIVIL ACTION NO.3:17cv517DPJ-FKB

KLLM TRANSPORT SERVICES, LLC                               DEFENDANT


**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS RESPONSE
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

## Table of Contents

I. INTRODUCTION ……………………………………………………… 1

II. BACKGROUND ……………………………………………………… 1

    A.    KLLM Transport Services, LLC …………………………………….. 1

    B.    Independent Contractor Agreements ………………………………… 2

    C.    Contractor Business Operations …………………………………… 2

    D.    Contractor Compensation …………………………………………. 4

    E.    Hours Worked by Contractors …………………………………….. 4

III. ARGUMENT ………………………………………………………… 6

    A.    The Court should apply a heightened evidentiary standard, not the
        "fairly lenient" standard from *Lusardi v. Xerox Corp.*…….………… 8

        1.    Substantial class and merits discovery has taken place...……… 9

        2.    Courts in the Fifth Circuit reject conditional certification when
            warranted by discovery..……………………………………… 10

    B.    Plaintiffs have disparate factual settings and are not "similarly situated"
        for application of the "economic realities" test to determine if the
        contractors are misclassified..…………………………………….. 12

        1.    Plaintiffs are not "similarly situated" as it relates to the alleged
            degree of control exercised by KLLM. …………………………. 14

        2.    Plaintiffs are not "similarly situated" as regarding the extent of
            the relative investments of the Plaintiffs and the alleged
            employer…………………………………………………… 17

        3.    Plaintiffs are not "similarly situated" when considering the
            degree to which the Plaintiffs' opportunity for profit and loss is
            controlled by KLLM among the Plaintiffs………………………. 18

        4.    The permanency of the Plaintiffs' relationship with KLLM spans
            one month to four years such that they are not "similarly
            situated.……………………………………………………… 23

i

C.      The Plaintiffs have not shown KLLM had a uniform policy of paying less than minimum wage………………………………………………..   24

     1.     The week-by-week individualized damages claimed by each Plaintiff varies significantly, necessitating individualized defenses by KLLM because the Plaintiffs are not "similarly situated."……………………………………………………..   25

     2.     The net amount paid on contractors' settlements shows they are not "similarly situated" because week-by-week elective deductions and advances are personal to each…..…………………….   27

     3.     The lack of records will shift the burden to KLLM to defend the varying hours claimed…………………………………………….   29

D.      Fairness and procedural concerns necessitate declining to conditionally certify the class……………………………………………………….   31

E.      Alternatively, if conditionally certified, the class should be limited in both time and scope……………………………………………………….   32

     1.     The class should extend back only three years from the date of the order granting conditional certification………………………..   32

     2.     The class should exclude those contractors who first signed an ICA on or after September 25, 2017……………………………   33

F.      If conditionally certified, then Plaintiffs are only entitled to the mailing addresses………………………………………………………...   34

IV. CONCLUSION………………………………………………………………   36

## Table of Authorities

### CASES

*Acevado v. Allsup's Convenience Stores, Inc.,* 600 F.3d 516 (5th Cir. 2010)…………..   8, 9, 12

*Adamson v. W.R. Coleman Excavation, LLC,* 2017 WL 4180008 (D. Utah 2017) ……   28

*Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287 (S.D. Tex. 2012)………… 13, 17, 30

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) …………………………   30

*Arceo v. Orta* 296 F. Supp. 3d 818 (N.D. Tex. 2017)…………………………………   35

*Baldwin v. Hale*, 68 U.S. 223 (1863) ……………………………………………………   31

*Basco v. Wal-Mart Stores, Inc.,* 2004 WL 1497709 (E.D. La. 2004) …………………   10-12, 32

*Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977 (D. Kan. 2018) ………………   14, 16

*Boshart v. Armstrong National Security Force, LLC,* 2016 WL 7976115 (S.D. Miss. 2016) …………………………………………………………………………   9

*Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042 (5th Cir. 1987) ………………………   12, 22

*Brooks v. Illusions, Inc.*, 2016 WL 6871244 (S.D. Miss. 2016)………………………..   8, 9

*Brown v. Phenix Transportation West, Inc.*, 2016 WL 3648274 (S.D. Miss. 2016) …..   9, 11

*Camesi v University of Pittsburgh Medical Center,* 2011 WL 6372873 (W.D. Pa.) …..   27

*Campbell v. City of Los Angeles,* 903 F.3d 1090 (9th Cir. 2018) ………………….....   32

*Christianson v. NewPark Drilling Fluids, LLC,* 2015 WL 1268259 (S.D. Tex. 2015)……………………………………………………………………… 6, 12, 13, 23, 24

*Clay v. Huntington Ingalls, Inc.,* 2012 WL 860375 (E.D. La. 2012) ………………… 11, 12, 30

*Davis v. Charoen Pokphand (USA), Inc.,* 303 F. Supp. 2d 1272 (M.D. Ala. 2004)…….   9

*Demauro v. Limo, Inc.,* 2011 WL 9191 (M.D. Fla. 2011)………………………………   31

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)………………………………………..   8

*Donovan v. Techo, Inc.*, 642 F.2d 141 (5th Cir. 1981) ………………………………..   12

*Douglas v. First Student, Inc.,* 888 F. Supp. 2d 929 (E.D. Ark. 2012) ..................... 31, 32

*Dziennik v. Sealift, Inc.,* 2006 WL 1455464................................................................. 34

*Eagle v. Freeport-McMoran, Inc.,* 2016 WL 7494278 (D.N.M. Aug. 3, 2016)............ 27

*Eberline v. Media Net LLC*, 2013 WL 11609929 (S.D. Miss. 2013)........................ 9

*England v. New Century Fin. Corp.,* 370 F. Supp. 2d 504 (M.D. La. 2005) ............... 30, 31

*Epic Systems Corp. v. Lewis,* 138 S. Ct. 1612 (2018) ........................................ 34

*Gatewood v. Koch Foods of Mississippi, LLC,* 2009 WL 8642001 (S.D. Miss. 2009) ..... 6, 31

*Harris v. Fee Transp. Servs., Inc.,* 2006 WL 1994586 (N.D. Tex. 2006).................... 9, 12

*Heeg v. Adams Harris, Inc.,* 907 F. Supp. 2d 856 (S.D. Tex. 2012) ........................ 13

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299 (5th Cir. 1998)...... 12-17

*Huddleston. v. John Christner Trucking, LLC,* 2018 U.S. Dist. LEXIS 73149
(N.D. Okla. 2018)................................................................................................ 11

*Humphries v. Stream Inter., Inc.,* No. 3:03-CV-1682-D (N.D. Tex. Feb. 13, 2004)........ 35

*King v. West Corp.*, 2006 WL 118577 (D.Neb. 2006) ......................................... 31

*LaFleur v. Dollar Tree Stores,* 2012 WL 4739534 (E.D. Va. 2012) ........................ 9

*Lemmers v. Gary Pools, Inc.,* 2016 WL 7508075 (W.D. Tex. 2016)........................ 33

*Lopez v. Bombay Pizza Co.*, No. H–11–4217, 2012 WL 5397192
(S.D. Tex. Nov. 5, 2012)....................................................................................... 34

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987) ..................................... 8-12, 30

*Mooney v. Aramco Servs. Co.,* 54 F.3d 1207 (5th Cir. 1995)................................ 8

*Nguyen v. Versacom, LLC,* 2015 WL 1400564 (N.D. Tex. Mar. 27, 2015)................. 35

*Perez v. City of New Orleans*, 2015 WL 4547505 (E.D. La. 2015)........................... 33

*Prizmic v. Armour, Inc.*, 2006 WL 1662614 (E.D.N.Y. 2006)................................ 32

*Quintanilla v. A & R Demolitina, Inc.,* 2005 WL 2095104 (S.D. Tex. 2005).............. 33

*Reich v. Circle C. Investments, Inc.,* 998 F.2d 324 (5th Cir. 1993) ……………………… 13, 14

*Rosario v. Valentine Ave. Discount Store, Co., Inc.,* 828 F. Supp. 2d 508 (E.D.N.Y. 2011)……………………………………………………………….. 35

*Sandoval v. Carrco Painting Contractors,* 2016 WL 8674067 (W.D. Tex. 2016) ………. 33

*Santinac v. Worldwide Labor Support of Illinois, Inc.,* 107 F. Supp. 3d 610 (S.D. Miss. 2015)……………………………………………………………… 34

*Shusan v. Univ. of Colo.,* 132 F.R.D. 263 (D. Colo. 1990) ………………………… 8

*Taylor v. McLane Foodservice, Inc.,* 2013 WL 943531 (D. Kan. Mar. 11, 2013)……….. 7, 24

*Thiessen v. Gen. Elec. Capital Corp.,* 996 F. Supp. 1071 (D. Kan. 1998)……………… 10

*Tolentino v. C & J Spec-Rent Servs., Inc.,* 716 F. Supp. 2d 642 (S.D. Tex. 2010) ……… 8, 33

*Valcho v. Dallas Cty. Hosp. Dist.,* 574 F. Supp. 2d 618 (N.D. Tex. 2008)……………… 9-12

*Walker v. Honghua Am.,* 870 F. Supp. 2d 462 (S.D. Tex. 2012) ………………………… 13

*Wass v. NPC Int'l, Inc.,* 688 F. Supp. 2d 1282 (D.Kan. 2010) …………………………… 7

*Watson v. Travis Software Corp.,* 2008 WL 5068806 (S.D. Tex. 2008) …………………. 33

*Wells Fargo Wage & Hour Emp't Practices Litig. (No. III),* No. H–11–2266, 2013 WL 2180014 (S.D. Tex. May 17, 2013)……………………………………………… 35

## STATUES AND REGULATIONS

29 U.S.C. § 206……………………………………………………………….. 7, 24

29 U.S.C. § 216……………………………………………………………….. 6

29 U.S.C. § 255 (1947)……………………………………………………….. 32

29 U.S.C. § 256(b) ……………………………………………………………… 32

49 U.S.C. § 13901……………………………………………………………… 15

49 U.S.C. § 13902……………………………………………………………… 15

49 U.S.C. § 14102……………………………………………………………… 15

29 C.F.R. 785.22(a)…………………………………………………………………….. 26

49 C.F.R. § 365……………………………………………………………………. 15

49 C.F.R. Subpart B §§ 376.11……………………………………………………2, 11, 15

49 C.F.R. Subpart B §§376.12…………………………………………………….. 2, 15

49 C.F.R. § 395.3……………………………………………………...4, 5, 15, 21, 29

OTHER AUTHORITIES

*Wage and Hour Opinion Letter of Mar. 20, 1998,* 1998 WL 852662…………………… 28

U.S. DOL, Wage & Hour Division Field Operations Handbook § 30c10(b) (available at
https://www.dol.gov/whd/FOH/index.htm) …………………………………………… 28

# I.  INTRODUCTION

Corey Lilly, Kyle Shettles, John McGee and Marcus Jowers ("Named Plaintiffs") brought the now consolidated cases asserting that independent contractors of KLLM should be reclassified as employees and awarded damages under the Fair Labor Standards Act ("FLSA") for failure to pay minimum wage during all work periods.  Charles Hallmark, Donald Tillman, Colton Miller and James Johnson ("Opt-In Plaintiffs") have already opted in to the FLSA suit as opt-in parties of a proposed class that may include over 6,500 independent contractors ("Opt-In Contractors").[1] "Plaintiffs" herein collectively refers to both the Named Plaintiffs and the Opt-In Plaintiffs.

# II. BACKGROUND

### A.  KLLM Transport Services, LLC

KLLM is a motor carrier that is authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to provide transportation of property for hire to the public.  It provides its services to shippers of goods nationwide, primarily in the area of refrigerated shipments. KLLM provides this service through the use of company owned trucks operated by its employee drivers and the use of trucks provided by its independent contractors, along with their drivers.[2]

KLLM contracts with individuals and entities who own equipment or have access to equipment either through separate financing, other leasing companies or KLLM's lease purchase option.  The services provided by KLLM are distinct from those offered by its contractors because contractors cannot offer for hire service to third parties without motor carrier authority from the FMCSA.[3]  None of the Plaintiffs have motor carrier authority like KLLM.

---

[1] Plaintiffs' Brief (Doc. 193-1) at p. 5.
[2] Ex. 1, Declaration of Brenda Beard ("Beard Decl.") at ¶ 7.
[3] Ex. 1, Beard Decl. at ¶ 9-10.

### B.    Independent Contractor Agreements

Every independent contractor signs an Independent Contractor Agreement ("ICA") with KLLM. Only those who take advantage of the lease purchase option sign a Lease Purchase Agreement ("LPA").[4]

Many of the terms and conditions in the ICA are required by the leasing regulations at 49 C.F.R. Subpart B §§ 376.11 and 376.12 ("Leasing Regulations").  The Leasing Regulations require that various items such as the manner of compensation, deductions, escrow, maintenance fund, insurance, and other requirements be set forth in the text of the lease.  Contractors may accept or reject loads.  ICA, § 3(B), (D). Contractors are never forced to accept loads offered, nor are they force dispatched.  ICA, §3(B).  Contractors may select their own routes and methods of delivery as long as they comply with the hours of service regulations.  ICA, §3(C).[5]

Contractors may substitute other drivers as long as the driver meets the FMCSA imposed regulations for driver qualification.  ICA, §3(D).  Contractors are free to set their own hours of operations and to work when and where they choose.  ICA, §3(D).  Scope of work requirements are governed by the shipper and the contractor agrees to that scope of work when a load is accepted.  ICA, §§ 3(B) and 3(D).  KLLM does not care how the work is accomplished, only that it is completed.[6]

### C.    Contractor Business Operations

KLLM's ICA provides contractors as much freedom as possible to operate their business without violating the FMCSR. The contractor may provide personal driver services to anyone while the equipment is under lease to KLLM.  The ICA does not have a non-compete provision

---

[4] Ex. 1, Beard Decl. at ¶ 11.
[5] Ex. 1, Beard Decl. at ¶ 18-19.
[6] Ex. 1, Beard Decl. at ¶ 20.

2

preventing the contractor from taking on other work, rather it only limits the use of the equipment provided to KLLM under the ICA.  KLLM's ICA focuses on overall performance and contractor responsibility, not on the means and methods by which that contractor performs its contractual obligations.[7]

The contractor is not required to be the actual driver.  In fact, many contractors hire employees to drive their trucks.  In this case, Shettles hired Tillman to drive as his employee after Tillman's ICA terminated on December 27, 2016.  Shettles was responsible for paying Tillman directly after he became his employee co-driver.[8]

Like Shettles, other contractors elect to have employees operate the equipment leased to KLLM, usually via teams where both contractor and the contractor's employee drive the tractor. There were 427 teams between January 1, 2016 and January 14, 2019, in which one person or entity entered an ICA with KLLM and hired a driver employee to operate the equipment as a team. Therefore, at least 427 additional drivers would have been employed by those 427 contractors and paid by those contractors, not by KLLM.[9] Because contractors who drive as a team take turns driving, this allows them to maximize revenue while lowering the impact of fixed costs such as the lease payment, insurance, and other expense deductions on profit.[10]

Contractors may elect to lease a truck from KLLM rather than lease or buy from a third party.  The contractor must sign an LPA which addresses the responsibilities and liabilities related to the tractor.  At the end of the lease, or sooner if they wished to do so, each contractor, including the Plaintiffs, had the right to purchase their tractors for $1.00 per the Lease Purchase

---

[7] Ex. 1, Beard Decl. at ¶ 12-13.
[8] Ex. 1, Beard Decl. at ¶ 14.
[9] Ex. 1, Beard Decl. at ¶ 15.
[10] Ex. 1, Beard Decl. at ¶ 16. The earnings for that contractor's truck would include the work of two drivers, not just one, as all the miles for that truck would be applied to a single settlement statement. *Id.*

Agreement at paragraph 2(b).  Therefore, each payment made built equity each contractor could realize either at the end of the lease or by refinancing to purchase the tractor sooner.[11]

### D.      Contractor Compensation

Contractors are paid via settlement statements that reflect their revenue, reimbursements and deductions for each settlement period.  Pay for contractors during the potential period at issue was either a percentage of linehaul revenue or by the mile. Rates are determined by the selection of available options at the time the contractor signs the ICA.[12] The mileage rates vary in amount depending on the fleet (OTR, Regional, Dedicated) and can range from 0.90 cents to $2.05 per mile.[13]  The rates also vary based on the number of miles of any particular load and may contain guaranteed payments under certain circumstances.[14]  Compensation along with the method for advances and deductions is discussed in more detail later in the brief in part III(C) and paragraph 22 to 39 of the Declaration of Brenda Beard at Exhibit 1.

### E.      Hours Worked by Contractors

Contractors are required to follow strict government regulations called the hours of service regulations, promulgated by the FMCSA ("HOS Regulations").[15]  The HOS Regulations define what is meant by off-duty, on-duty, driving and sleeper berth.[16] By following the regulations the contractors recorded their hours worked each day. KLLM contractors pick up and deliver freight to or from KLLM's customers on a daily basis.  They are required by the FMCSA to do this

---

[11] Ex. 1, Beard Decl. at ¶ 42.
[12] Ex. 1, Beard Decl. at ¶ 22.
[13] Ex. 32, App. B Rate Addendums at pp. KLLM 8901, KLLM 8905.
[14] During the period of time likely to apply to this matter KLLM has had available to Contractors approximately forty-one (41) different Appendix B compensation offers from which they could choose. Ex. 1, Beard Decl. at ¶ 23; Ex. 32, to KLLM's Response, Bates Numbered documents KLLM 8901 to 8966.  The pay ranges were wide and varied as shown in Exhibit 32.
[15] 49 C.F.R. Part 395; *see, e.g.,* Ex. 8, Hallmark Depo. at pp. 59-60; Ex. 9, Johnson Depo. at p. 104; Ex. 11, Lilly Depo. at p. 61.
[16] 49 C.F.R. §395.2.

safely and to comply with the HOS Regulations while operating their tractor.  These pick-ups and deliveries can occur anywhere in the continental United States or Canada at all hours of the day and night.  The loads available for contractors may vary week-by-week and sometimes day-by-day.  As a result, no contractor operates on the same schedule or works the same or similar hours.[17]

A review of each contractor's Fourth Supplement to Interrogatory Number 2 appended as Exhibits 16 – 23 shows that where all records were available each contractor's hours worked varied week-by-week.  For weeks where there were no hours of service records showing the actual time worked for the week, the average of the known hours is presented by the Plaintiffs.  For example, Miller's claim uses 168 hours per week because there are no records available for him.[18]  McGee, on the other hand, uses 144 hours per week as his average for weeks where there are no records based on the weeks of June 9, 2016 to November 17, 2016, where sufficient records existed to calculate claimed hours and compute an average.[19]

The HOS regulations provide contractors with a 14-hour window within which to drive not more than 11 hours and limited total on-duty and driving time to 70 hours over a period of eight consecutive days ("70 hour Rule").[20]  Contractors are required to complete a record of duty status twenty-four hours a day.[21]  Each of the Plaintiffs in this matter understood the importance of accurately recording their time in their logs, although some admitted not doing so.[22]

---

[17] Ex. 1, Beard Decl. at ¶ 21.
[18] Ex. 21, Miller's 4th Supp. to Inter. No. 2. This figure is based on a 24-hour, 7-day-a-week workweek.
[19] Ex. 20, McGee's 4th Supp. to Int. No. 2.
[20] 49 C.F.R. §395.3.
[21] 49 C.F.R. §395.8.  KLLM used an electronic logging device ("ELD") that recorded the time the contractor was driving.  The contractor had to manually make some changes, such as off duty to sleeper berth or vice-versa.  *E.g.,* Ex. 11, Lilly Depo. at p. 64.  Newer ELD's will be in Opt-In Contractor vehicles due to new requirements for ELD's in recent amendments to the regulations.  49 C.F.R. § 395.8.
[22]  Ex. 9, Johnson Depo. at p. 104; Ex. 10, Jowers Depo. at pp. 38-39; Ex. 8, Hallmark Depo. at pp. 59-60; Ex. 15, Tillman Depo. at p. 51; Ex. 14, Shettles Depo. at pp. 22-26; Ex. 13, Miller Depo. at pp. 65-66.

# III. ARGUMENT

There are three main considerations when determining if Plaintiffs are similarly situated under the FLSA: (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."[23] Because in this case these three considerations necessitate an individualized analysis that is not possible in a collective action setting, conditional certification would be improper.

The substantial discovery, on which the Plaintiffs rely in their Motion for Conditional Certification, demonstrates "that the putative class members' circumstances are significantly dissimilar with respect to the economic realities factors that will later need to be analyzed for FLSA coverage purposes to determine whether a worker was improperly classified by [KLLM] as an independent contractor."[24] Due to the extensive discovery conducted in this matter from May 11, 2018 until November 30, 2018, this Court should not apply the fairly lenient standard to this matter, but should apply a heightened evidentiary review of the evidence collected to date and deny conditional certification.

The Plaintiffs in this matter assert that three policies violate the FLSA. First, Plaintiffs argue that KLLM illegally misclassifies its drivers as independent contractors.  Misclassifying a worker in such a manner does not automatically violate the FLSA,[25] and indeed misclassification is a threshold question to be resolved before the Court can even address the FLSA claims. Second, Plaintiffs appear to consider KLLM's per mile pay structure an illegal piece rate system.

---

McGee understood they had to be accurate but denied understanding how to log his time.  Ex. 12, McGee Depo. at pp. 269-272.  Lilly admitted he did not always accurately record his time.  Ex. 11, Lilly Depo. at pp. 61-66.
[23] *Gatewood v. Koch Foods of Mississippi, LLC,* 2009 WL 8642001, at *13 (S.D. Miss. 2009).
[24] *Christianson v. NewPark Drilling Fluids, LLC,* 2015 WL 1268259, at *4 (S.D. Tex. 2015).
[25] 29 U.S.C. §216 (holding employers liable only for failing to pay a minimum wage).

6

Piece rate pay does not automatically violate the FLSA.[26] Third, Plaintiffs claim the deduction of business expenses from the Plaintiffs' gross revenue is prohibited. Simply deducting business expenses from a workers' pay also does not violate the FLSA.[27] Because these policies standing alone do not violate the FLSA, Plaintiffs must prove that each Plaintiff and the absent class members first were misclassified as contractors and then that they were paid an hourly rate less than $7.25 per pay period.[28] These questions turn not on a uniform policy of KLLM, rather it turns on evidence unique to each contractor.

The Plaintiffs have not shown that KLLM has a uniform policy of misclassifying the Plaintiffs as independent contractors. The Named Plaintiffs' claims are based on personal experiences and beliefs of each, many directly contrary to the terms of the ICA, rather than a common policy of KLLM.  Plaintiffs assert that they have shown common proof across the alleged collective that would allow the economic realities test to be applied to the collective rather than each individual contractor. Substantial discovery on the question of control alone shows there are at least thirty-seven (37) points of conflicting evidence establishing there is no commonality among the Plaintiffs, much less the absent Opt-In Contractors, when it comes to analyzing the degree of control exercised by KLLM.

Plaintiffs then assert that the pay practices among the collective are common. In reality, the only thing common to the collective is that they all get a settlement statement. The settlement statement tallies up Plaintiffs' various choices regarding the number of loads accepted or rejected, individual choice of route, the decision to take a longer load (more miles) or shorter load (less

---

[26] *Taylor v. McLane Foodservice, Inc.,* 2013 WL 943531, at *7 (D. Kan. Mar. 11, 2013)(holding a miles-based pay structure is not illegal under the FLSA).

[27] *Wass v. NPC Int'l, Inc.,* 688 F. Supp. 2d 1282, 1288 (D.Kan. 2010)(deducting business expenses or failing to reimburse for same must bring plaintiffs wages below minimum wage before the deduction is illegal).

[28] 29 U.S.C. § 206

miles)(which directly impacts the per mile gross revenue), how many days to take off in any week, clock management and other matters that impact revenue.   The settlement statement then deducts the advances requested by the contractor for that week and deducts the individual optional deductions for non-mandatory items, deducts personal garnishments, and other mandatory deductions (*e.g.* insurance, occupational accident, Qualcomm rental, etc.). The evidence established in discovery to date clearly shows there is no commonality among these eight Plaintiffs or the larger collective because whether they each will make minimum wage for any given week is impacted by choices of each individual, not by an illegal uniform policy that violates the FLSA.

### A. The Court should apply a heightened evidentiary standard not the "fairly lenient" standard from Lusardi v. Xerox Corp.

Courts in the Fifth Circuit typically utilize the *Lusardi*[29] method when dealing with FLSA collective actions, which "advises a two-step certification analysis: (1) the notice stage, and (2) the 'opt-in,' 'merits,' or decertification stage."[30] The Plaintiffs champion this analysis.

The typical *Lusardi* analysis uses a *fairly lenient standard*, requiring only "substantial allegations that the putative class members were together victims of a single decision, policy, or plan" making them sufficiently similar to merit sending a notice to other possible class members.[31] However, the Fifth Circuit has explicitly left open the question of whether the *Lusardi* approach, the *Shushan*[32] approach, or some third approach should be used in determining whether

---

[29] *Lusardi v. Xerox Corp.*, 188 F.R.D. 351 (D.N.J. 1987).

[30] *See, e.g., Brooks v. Illusions, Inc.*, 2016 WL 6871244 (S.D. Miss. 2016)(*citing Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1214 (5th Cir. 1995), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); s*ee also, Tolentino v. C & J Spec-Rent Servs., Inc.,* 716 F. Supp. 2d 642, 646-47 (S.D. Tex. 2010)(collecting cases).

[31] *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1214 (5th Cir. 1995)(emphasis added); *Acevado v. Allsup's Convenience Stores, Inc.,* 600 F.3d 516, 519 (5th Cir. 2010).

[32] *Shusan v. Univ. of Colo.,* 132 F.R.D. 263 (D. Colo. 1990)(Adopting a standard more similar to the Rule 23 class action analysis where the court is to look at factors such as numerosity, commonality, typicality, and adequacy of representation).

employees' claims are sufficiently similar to support the maintenance of a representative action.[33]

Moreover, the question of whether a more stringent standard should be used at conditional

certification in an FLSA collective action <u>after</u> substantial discovery has already been conducted,

as in this case, has not been addressed by the Fifth Circuit or in the Northern or Southern District

of Mississippi.[34]

One of the rationales for the leniency provided under the *Lusardi* approach is that "at the

early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best

evidence. This rationale disappears, however, once the plaintiffs have had an opportunity to

conduct discovery."[35] This is why plaintiffs typically move for conditional certification early in

the litigation arguing that, at that stage, their evidentiary burden is light.[36] Put simply, "where the

parties have had the opportunity to conduct discovery on the issue of certification, the similarly

situated inquiry is more stringent."[37]

### 1. Substantial class and merits discovery has taken place.

The Complaint in the Lilly case was filed June 21, 2017. The Complaint in the Jowers case

was filed only seven days later. The two cases were consolidated for discovery purposes March

29, 2018. The Case Management Order (ECF Doc. 66) was entered May 11, 2018, and after several

extensions, the discovery deadline expired October 31, 2018. (Text Order of 9/17/18).

---

[33] *Acevado,* 600 F.3d at 519 (5th Cir. 2010).

[34] Defendant has only located four FLSA cases involving allegations of misclassification in the district courts of Mississippi. *Boshart v. Armstrong National Security Force, LLC*, 2016 WL 7976115 (S.D. Miss. 2016)(conditional certification denied; motion filed eleven days after discovery served); *Brooks v. Illusions, Inc.*, 2016 WL 6781244 (S.D. Miss. 2016) (conditional certification granted; no discovery conducted); *Eberline v. Media Net LLC*, 2013 WL 11609929 (S.D. Miss. 2013) (conditional certification granted; no discovery conducted); *Brown v. Phenix Transportation West, Inc.*, 2016 WL 3648274 (S.D. Miss. 2016)(conditional certification granted; no discovery conducted).

[35] *Valcho v. Dallas Cty. Hosp. Dist.*, 574 F. Supp. 2d 618, 622 (N.D. Tex. 2008)(*citing Davis v. Charoen Pokphand (USA), Inc.,* 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004)).

[36] *See, e.g. LaFleur v. Dollar Tree Stores,* 2012 WL 4739534 (E.D. Va. 2012).

[37] *Harris v. Fee Transp. Servs., Inc.,* 2006 WL 1994586, at *3 (N.D. Tex. 2006)(collecting cases).

The Plaintiffs had over a year a half to file their Motion for Conditional Certification and over five months of extensive discovery. The Declaration of Clark Monroe at Exhibit 2 notes discovery included eleven depositions, extensive written discovery and production of over 19,000 documents, among numerous other things.[38] So much discovery occurred, the Plaintiffs even hired an expert witness, Steve Viscelli, to support their motion for conditional certification.[39]

In *Valcho*, the plaintiffs "had the benefit of three months of discovery," giving rise to a heightened evidentiary standard at the conditional certification step, rather than the "fairly lenient" standard from *Lusardi*.[40] Similarly, in *Thiessen v. Gen. Elec. Capital Corp.*,[41] the court noted the Plaintiff was "beyond the notice stage" after three months of discovery and having obtained opt-in plaintiffs, and analyzed the "similarly situated" issue under a heightened evidentiary standard. The Plaintiffs here have voluntarily submitted themselves to the heightened evidentiary standard.

### 2. Courts in the Fifth Circuit reject conditional certification when warranted by discovery.

In *Basco v. Wal-Mart Stores, Inc.*,[42] the court refused to conditionally certify the collective action after considering the "substantial discovery" that had already been conducted. The court's rationale in *Basco* was that "[b]ecause the aim of collective actions is to promote judicial economy, and substantial discovery has already been undertaken such that the Court can make an educated decision as to whether certifying this matter as a collective action would survive the decertification process, the ends of judicial economy require the Court to make that inquiry at this stage."[43] The *Basco* Court went further to say that, "[t]o create a collective action class, including the cost

---

[38] Ex. 2, Declaration of Clark Monroe ("Monroe Decl.") at ¶¶ 3-4.
[39] Docket 195-24, Viscelli Expert Report.  This report was never disclosed in discovery but adds no value.
[40] *Valcho*, 574 F. Supp. 2d at 623 (N.D. Tex. 2008); *see* Case Management Order at Docket 67, p. 7.
[41] 996 F. Supp. 1071, 1080-81 (D. Kan. 1998).
[42] 2004 WL 1497709 (E.D. La. 2004).
[43] *Id.* at *4.

associated with that when a Court is convinced that there is insufficient support for same prior to its certification would be an exercise in futility and wasted resources for all parties involved."[44]

In *Clay v. Huntington Ingalls, Inc.,*[45] the court determined that a "more demanding analysis of the certification issue [was] appropriate in light of the *substantial discovery* that [had] already taken place[.]"[46] The court ruled that "[t]he collective action mechanism of the FLSA serves no utility if thousands of plaintiffs join together in one lawsuit only to then try their claims individually," and determined that because of information revealed through discovery, "the Court should [not] simply ignore the fact that certain individualized defenses might apply and postpone the issue until decertification."[47]

In their brief, Plaintiffs assert that "[c]ourts regularly grant conditional certification in cases which a plaintiff alleges he or she was misclassified as an independent contractor and owed wages under the FLSA." (Brief at pp. 24-25, ECF Doc. 193-1). However, none of the eight cases cited in support of this misleadingly broad statement are applicable here. Absolutely zero discovery – either in the form of depositions or written discovery – was noted on the dockets as having taken place prior to the Plaintiffs filing their respective motion for conditional certification in seven of the eight cases.[48] In only one case, *Huddleston v. John Christner Trucking, LLC*, did discovery take place, but the *Huddleston* Court acknowledged the Tenth Circuit "has not authorized the use of a heightened standard while discovery is still ongoing[.]"[49] This limitation is not present in the Fifth Circuit. The Fifth Circuit has explicitly left the question of what evidentiary standard to apply

---

[44] *Id.* at *4.
[45] 2012 WL 860375 (E.D. La. 2012).
[46] *Id.* at *3 (emphasis added).
[47] *Id.* at *3; *Clay* claims to use an "in-between" approach, different from both *Lusardi* and *Shushan*. Both *Valcho* and *Basco* claimed to use the *Lusardi* approach, but combine the first and second steps.
[48] Ex. 2, Monroe Decl. at ¶ 5 (attaching case docket reports); *Brown v. Phenix Transportation West, Inc.,* 2016 WL 3648274 (S.D. Miss. 2016)(discovery served but not answered before motion filed).
[49] *Huddleston. v. John Christner Trucking, LLC,* 2018 U.S. Dist. LEXIS 73149 at *5 (N.D. Okla. 2018).

at the conditional certification step to the discretion of the district court.[50] More importantly, district courts in the Fifth Circuit have used this discretion to apply a heightened evidentiary standard at the conditional certification step when substantial discovery has taken place.[51]

The Defendant is unaware of any district court case in the Fifth Circuit where the plaintiffs are alleging the misclassification of employees as independent contractors *and* substantial discovery has taken place where the court has then elected to still only hold the plaintiffs to the lenient first step of the *Lusardi* analysis. The Court should not "blithely certify the action with a blind eye toward deficiencies that discovery has already revealed."[52] Using the heightened evidentiary standard, the Court should deny conditional certification.

### B. Plaintiffs have disparate factual settings and are not "similarly situated" for application of the "economic realities" test to determine if these contractors are misclassified.

The test used in the Fifth Circuit to determine worker classification is known as the "economic realities" test[53] – that is, whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he renders his services.[54] In other words, it is up to the court to determine whether the individual is, as a matter of economic reality, in business for himself or herself.[55] To accomplish this task, the court considers five factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and alleged employer; (3) the degree to which the worker's opportunity for profit and loss is

---

[50] *Acevado*, 600 F.3d at 518-519, n. 1 (5th Cir. 2010)(footnote states no one approach adopted).
[51] *See, e.g., Valcho v. Dallas Cty. Hosp. Dist.*, 574 F. Supp. 2d 618, 622 (N.D. Tex. 2008); *Harris v. Fee Transp. Servs., Inc.*, 2006 WL 1994586, at *3 (N.D. Tex. 2006); *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *4 (E.D. La. 2004); *Clay v. Huntington Ingalls, Inc.*, 2012 WL 860375, at *3 (E.D. La. 2012); *Andel v. Patterson-UTI Drilling Co., LLC*, 280 F.R.D. 287 (S.D. Tex. 2012); *Christianson v. NewPark Drilling Fluids, LLC*, 2015 WL 126859 (S.D. Tex. 2015).
[52] *Clay v. Huntington Ingalls, Inc.*, 2012 WL 860375, at *3 (E.D. La. 2012).
[53] *Herman v. Express Sixty-Minutes*, 161 F.3d 299 (5th Cir. 1998).
[54] *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 141, 143 (5th Cir. 1981).
[55] *Donovan v. Techo, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981).

determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship."[56] No single factor is determinative.[57]

While there are some district courts in the Fifth Circuit that hesitate to use the "economic realities" test at the conditional certification stage,[58] in this matter the Court should analyze now whether the individual putative Plaintiffs are "similarly situated" in a way that will allow collective review of the "economic realities" later on the merits. In *Andel v Patterson-UTI Drilling Co., LLC*,[59] the court made this point clear:

> "Plaintiffs aver that all they need produce is '*some evidence* [Defendant] subjected a group of similarly situated potential class members to a single decision, policy, or plan [in violation of] the FLSA.' (citations omitted). Plaintiffs would be correct if there was no question whether the putative plaintiffs fell under the protections of the FLSA, but, rather, only whether the class were similarly situated to one another and subject to a single decision, policy, or plan. *Here, however, the court must first resolve whether the FLSA even covers each Plaintiff and, therefore, each putative plaintiff.*"[60]

There is also this clarification from the Southern District of Texas: "The Court emphasizes that it is not applying the economic realities test at this phase to decide whether workers at [the Defendant] were improperly classified as independent contractors. Instead, the Court is only evaluating whether Plaintiff has demonstrated that he and the putative class members are similarly situated for purposes of applying the economic realities test at the appropriate phase of this case in the future."[61]

---

[56] *Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 327 (5th Cir. 1993).

[57] *Id.*

[58] Although reaching a different conclusion, these decisions bear out the district court has discretion in the Fifth Circuit. *See, e.g., Heeg v. Adams Harris, Inc.,* 907 F. Supp. 2d 856, 864 (S.D. Tex. 2012)(comparing other circuits; motion based on complaint and affidavits, not substantial discovery); *Walker v. Honghua Am.,* 870 F. Supp. 2d 462, 470 (S.D. Tex. 2012)(noting same split among district courts even in Texas).

[59] 280 F.R.D. 287 (S.D. Tex. 2012).

[60] *Andel*, 280 F.R.D. at 295 (from magistrate's recommendation adopted by district court denying conditional certification)(emphasis added and in original).

[61] *Christianson v. NewPark Drilling Fluids, LLC*, 2015 WL 1268259, at *4 (S.D. Tex. 2015).

The Viscelli report waxes extensively on his view of how the industry, and KLLM in particular, operates.[62]   Much of what Viscelli's report states is directly contrary to the written contracts KLLM has with the Plaintiffs. He cites instances where the Plaintiffs give individual accounts regarding their personal experiences and makes credibility judgments regarding the testimony of KLLM witnesses.[63]   However, all his report does is support KLLM's position that in regard to the misclassification question, there is not a common policy that could be applied to an entire class, rather the individual experiences of each contractor must be evaluated.[64]

Review of the diverse facts distributed among the Plaintiffs shows there is not a common policy that can be applied to the proposed putative class that is determinative on the question of misclassification, a uniquely fact intensive individual inquiry.

1.  *Plaintiffs are not "similarly situated" as it relates to the alleged degree of control exercised by KLLM.*

The first factor in the economic realities test is the alleged degree of control exercised by the putative employer.[65] The relevant facts that lend to the control factor widely vary among the eight named and opt-in Plaintiffs and thus, the "totality of the circumstances" is unique to each Plaintiff. "This conclusion is typical in cases where it must be determined whether the putative plaintiffs are employees or independent contractors. Courts typically deny collective certification in these cases, because the proof necessary to determine whether the putative plaintiffs are employees or independent contractors cannot generally be applied to the class as a whole."[66]

---

[62] Viscelli Report, Docket 193-24, pp. 13-20.

[63] *Id.* at pp. 30-31.  The report focuses heavily on re-powers and other 'management' facts which in the end would be additional testimony the Court would need to evaluate as it looked at each contractors individual experiences. *Id.* at 32.

[64] KLLM is not asking for a decision on the merits of the misclassification question here, nor does it concede any particular Plaintiff is or may be an employee.

[65] *Reich,* 998 F.2d at 327.

[66] *Blair v. TransAm Trucking, Inc.*, 309 F. Supp. 3d 977, 1003, n. 182 (D. Kan. 2018)(collecting cases).

Many of the terms and conditions in the ICA are required by the Leasing Regulations mandated by the FMCSA found at 49 C.F.R. Subpart B §§ 376.11 and 376.12 ("Leasing Regulations"). While the Leasing Regulations govern many of the provisions that are found in the ICA, they specifically require that the motor carrier shall "have exclusive possession, control and use of the equipment for the duration of the lease."[67]   Notwithstanding this requirement, the Leasing Regulations also confirm that nothing provided there "is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements."[68]

Therefore, there must be a determination made by review of factors indicating control beyond those mandated by the regulations or customer requirements. The affidavits submitted by the contractors highlight "KLLM policies" that are controlled by federal law such as limitation on hauling for other shippers, taking loads from brokers and tracking hours of service[69] or controlled by customers such as time of delivery and time of pick-up.[70]   Following federal law and meeting customer requirements should not be considered a uniform KLLM policy, practice or procedure.

Regarding the control exerted by KLLM, an analysis of Plaintiffs' deposition testimony and other evidence, summarized in Exhibit 3, identified approximately 37 different facts

---

[67] 49 C.F.R. §376.12(c)(1).
[68] 49 C.F.R. §376.12(c)(4); 8 I.C.C.2d 669, 671 (1992)(stating inclusion of paragraph (c)(4) intended to give notice to the courts that paragraph (c)(1) was not intended to affect the independent contractor relationship with the motor carrier).
[69] Plaintiffs' Declarations, Docket 195-3 to 195-10, at ¶¶ 10, 11; 49 U.S.C. §§ 13901, 13902 (registration required); 49 C.F.R. Part 365 (application for authority); 49 C.F.R. Part 395 (hours of service).
[70] Plaintiffs' Declarations, Docket 195-3 to 195-10, at ¶

¶ 6, 7.

distributed among the Named Plaintiffs and Opt-In Plaintiffs that could point toward or against KLLM exerting control. There is no uniformity amongst the four Named Plaintiffs and four Opt-In Plaintiffs within the factors summarized on Exhibit 3, and there is *not a single factor* where two or more Plaintiffs provided uniform testimony or evidence. In *Blair v. TransAm Trucking Inc.,*[71] the district court looked at questionnaire responses to 27 different questions from the putative class related to the misclassification question.[72] The 477 respondents were only able to offer uniform responses to <u>one</u> of the 27 questions, leading the court to decertify the class.[73]

The Control Evidence Summary, attached at Exhibit 3, highlights vast individual differences among the four Named Plaintiffs and four Opt-In Plaintiffs.  For example, Opt-In Plaintiff Hallmark testified that he was in such control over his own business that he "fired" multiple KLLM dispatchers:

"Question: Did you ever have any problems with any dispatcher at KLLM?

Hallmark: I fired six or seven of them."[74]

Such a strong statement of independence standing alone might lead to a finding Hallmark is a contractor.  Then there is irreconcilably contradictory testimony from Named Plaintiff Jowers who stated that not only was he not allowed to reject loads offered to him by KLLM, but that KLLM threatened him with illegally placing an "abandonment" designation on his DOT record if he even attempted to refuse a load.[75] On the other hand,

---

[71] 309 F. Supp. 3d 977 (D. Kan. 2018).
[72] *Id.*
[73] *Id.* at 995.
[74] Ex. 8, Hallmark Depo. at p. 135. However, see the testimony of Named Plaintiff Jowers who testified he never had the power to do such a thing. Ex. 10, Jowers Depo. at p. 126.
[75] Ex. 10, Jowers Depo. at p. 23.  Named Plaintiff Lilly also supported Named Plaintiff Jowers, testifying that he could not refuse loads.  Ex. 11, Lilly Depo. at p. 37-8.

here is testimony from Opt-In Plaintiffs Miller, Hallmark, and Johnson that they were able

to reject loads, and Miller stated that no such threats were ever made to him.[76]

FLSA cases commonly have "facts pointing in both directions" regarding the issue of

employee status.[77] However, as the district court noted in *Andel:*

> "Even if, *arguendo,* the court later resolved the issue in favor of employee status
> for each of the [Plaintiffs], the briefs and evidence show that there are enough
> differences between each individual Plaintiff that the court would still be required
> to conduct an individualized analysis of each putative plaintiff before it could be
> satisfied that each one fell under the auspices of the FLSA. Simply put, because the
> [Plaintiffs] *cannot clearly be deemed FLSA employees without individualized
> analysis, neither can the putative plaintiffs.* As such, certifying a class action under
> these facts would be inappropriate and, quite simply, would not promote judicial
> economy."[78]

Here, the task of individualized analysis is palpable in the thirty-seven

contradictory points of evidence from the individual Plaintiffs summarized in Exhibit 3.

2.  *Plaintiffs are not "similarly situated" regarding the extent of the relative investments of
    the Plaintiffs and the alleged employer.*

The amount of money and other resources each contractor chose to invest into his business

varied greatly as well. Opt-In Plaintiff Tillman did not make a single payment toward his leased

equipment during the duration of his contract.[79] Named Plaintiffs Lilly, McGee and Shettles

invested $16,365.12, $23,728.18 and $27,338.99 respectively in the trucks they leased from

KLLM while Opt-In Plaintiff Hallmark invested over $109,799.37 in his, over seven times more

than the others.[80] The amount of money invested toward their lease purchase was not the only

---

[76] Ex. 13, Miller Depo. at pp. 91, 156-7; Ex. 8, Hallmark Depo. at p. 66; Ex. 9, Johnson Depo. at p. 45.
[77] *Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 305 (5th Cir. 1998)(internal
quotations omitted).
[78] *Andel,* 280 F.R.D. at 295-6 (from magistrate's recommendation adopted by district court denying
conditional certification)(emphasis added).
[79] Ex. 1, Beard Decl. at ¶ 50.
[80] Ex. 1, Beard Decl. at ¶¶ 43-49.  Each Plaintiff had the right purchase the tractor at the end of the lease
for $1.00 or sooner if they decided to do so.  *Id.* at ¶ 42.

major difference among the Plaintiffs' investments into their respective businesses. Further, within the potential opt-in class, there are 427 contractors who chose to invest additional time, wage obligations and resources into the employment and training of co-driver employees.[81]   In fact, among these eight Plaintiffs, Tillman later elected to become an employed co-driver of Shettles.[82]

Additional differences in investments made into their respective businesses include: (1) whether or not the Plaintiff opted to purchase a GPS unit; (2) whether or not the Plaintiff opted to install a refrigerator in his truck; (3) whether or not the Plaintiff opted to sleep in the sleeper berth in his truck or instead chose to pay for a hotel room; and (4) whether or not the Plaintiff elected to install a television in the tractor.[83]

3. *Plaintiffs are not "similarly situated" when considering the degree to which the Plaintiffs' opportunity for profit and loss is controlled by KLLM among the Plaintiffs.*

Plaintiffs have not shown a uniform policy of KLLM that controls the opportunity for profit or loss of each Plaintiff. As evidenced by each Plaintiff's testimony and their average weekly gross revenue and average adjusted weekly net revenue, each Plaintiff's business decisions, rather than a uniform policy or practice of KLLM, is what provided opportunity for profit and loss.

Each Plaintiff's ability to affect his own profits and losses is most evident in two ways: (1) the varying amounts of weekly average gross revenue and adjusted average weekly net revenue; and (2) the varying amounts of damages claimed by each Plaintiff.

Plaintiffs were asked in their depositions about how they controlled individual profitability and each had differing methods based on their own decision-making. Miller testified that he could manage his hours under the Hours of Service regulations to legally avoid taking a 34-hour reset by closely monitoring his 70-hour clock over eight consecutive days, allowing himself more available

---

[81] Ex. 1, Beard Decl. at ¶ 15.
[82] Ex. 1, Beard Decl. at ¶ 14; Ex. 14, Shettles Dep. At p. 55; Ex. 15, Tillman Depo. at pp. 76-7.
[83] Ex. 3, Control Evidence Summary at ¶¶ 1-37.

hours to drive and generate revenue.[84] This particular method is used by more experienced drivers, such as Miller, and can significantly increase revenue. Hallmark testified he could increase his profitability by managing his miles and fuel stop locations.[85] Lilly testified, yes, his selected fuel stops could affect his profitability, but he could also limit the idle time of his truck to increase profit.[86] Jowers testified that the only thing he could do to increase his profit was limit his time at home.[87]

Plaintiffs were also asked how they decided to accept or reject a load, another individual decision that impacted Plaintiffs' profitability.  Jowers testified that he only looked at one factor when determining whether to accept or reject a load: the number of hours he had available under the federal Hours of Service regulations relative to the number of hours needed for a particular load.[88] Hallmark testified that he looked at *three* different factors when making the same decision as Jowers: he looked at available hours of service, the location of the load, and his personal knowledge of the availability of subsequent loads that could be in the delivery area.[89] The number of parameters used by Miller in determining whether or not to accept or reject a load is two: the length of the load and the total pay for the load.[90] None of the Plaintiffs testified that KLLM told them how they should evaluate load profitability.

KLLM records indicate Jowers rejected at least six loads over the course of his contract with KLLM; Lilly rejected at least one; McGee rejected at least nine; Shettles rejected at least thirty-four, Hallmark rejected at least fifty-eight, Johnson rejected at least thirty-seven, Miller

---

[84] Ex. 13, Miller Depo. at p. 114-5.
[85] Ex. 8, Hallmark Depo. at pp. 163-4.
[86] Ex. 11, Lilly Depo. at p. 149.
[87] Ex. 10, Jowers Depo. at p. 52.
[88] Id. at p. 139.
[89] Ex. 8, Hallmark Depo. at p. 46.
[90] Ex. 9, Johnson Depo. at p. 61.

rejected at least fourteen, and Tillman rejected at least two.[91] That means there is an approximate variance of load refusals of 0.1 loads rejected per month (Lilly) and 4 loads rejected per month (Johnson). It is likely not a coincidence that KLLM records indicate Johnson, who drove the third-fewest miles for the second-highest average net profit,[92] rejected the most loads on average each week because he was careful to select profitable loads.  Had KLLM forced him to take unprofitable loads, such would not have been possible.

As shown on the next page in Table 1, Jowers averaged an adjusted average weekly net revenue of approximately $245.98 on four loads per week on average, while Hallmark, a more experienced driver, generated an adjusted average weekly net revenue of $1,330.22 on four loads per week on average.[93]  Clearly, KLLM provided the freedom for Jowers's business to fail, while Hallmark's was very successful. Opt-In Plaintiff Johnson, who averaged the second-highest average weekly revenue both in gross and net, drove the third fewest miles of all eight Plaintiffs.  Plaintiffs make unsupported allegations that KLLM controlled available miles or loads which impacted net profit, but Johnson's business management shows that simply driving more loads, or being offered more miles, is not the sole factor affecting profits and losses.  Table 1 bears out the wide difference in the net profit each Plaintiff could attain by employing various processes within the management of their businesses, completely unrelated to any alleged control by KLLM of the opportunity to be profitable.

---

[91] Ex. 1, Beard Decl., at ¶ 41.
[92] *See* Table 1, *infra.,* p. 21.
[93] Ex. 1, Beard Decl. at ¶ 26.

| Name | Party Status | Avg. Gross Revenue per Week | Avg. Empty Miles per Week | Avg. Loaded Miles per Week | Avg. Num. Loads per Week | Adjusted Avg Weekly Net Revenue[94] |
|---|---|---|---|---|---|---|
| Tillman | Opt-In | 1240.77 | 159 | 1147 | 4 | 220.97 |
| Jowers | Named | 1500.34 | 185 | 1418 | 3.04 | 245.98 |
| Shettles | Named | 1913.4 | 226 | 1858 | 3.4 | 792.04 |
| McGee | Named | 1988.56 | 253 | 1911 | 3.46 | 854.89 |
| Miller | Opt-In | 2089.22 | 209 | 1949 | 2.96 | 874.48 |
| Lilly | Named | 2043.74 | 228 | 2027 | 3 | 952.71 |
| Johnson | Opt-In | 2208.02 | 214 | 1669 | 4.27 | 1093.47 |
| Hallmark | Opt-In | 2540.95 | 249 | 2517 | 4 | 1330.22 |

Table 1: Weekly Average Gross and Net Revenue; Adjusted Average Weekly Net Revenue. [95]

The Court will be required to weigh evidence and testimony indicating that the individual decision by the contractor to accept or reject loads and the length of the load clearly affected profits or losses, a fact borne out above.   Further, each Plaintiff could legally operate on-duty or on-duty driving 14 hours a day, but no more than 70 consecutive hours in an eight-day period.[96]  Using the 70-hour limitation as the most hours they could pack into one week, Plaintiffs would have only been due a minimum of $507.50 for each week to meet minimum wage requirements. All but two Plaintiffs in Table 1 far exceeded that amount on average each week.  The jury will be required to sift evidence of how many hours each Plaintiff actually worked individually by week to determine if they were in fact 'underpaid' in any given workweek.

Turning to damages, the Plaintiffs have all detailed their damage claims for wages in their Interrogatory Response to Interrogatory Number 2.[97] Not one of the Plaintiffs is similar in amount.

---

[94] Adjusted Average Weekly Net Revenue = Net Settlement shown on Weekly Settlement statements, plus advances and voluntary deductions. Ex. 1, Beard Decl. at ¶ 27. KLLM does not concede that the weekly settlement is the pay period for computing FLSA damages, nor that an average is acceptable for actual damages on the merits. For the purposes of this motion it is sufficient to illustrate the point concerning the ability to have a profit or loss.

[95]  Ex. 1, Beard Decl. at ¶ 26-31.

[96] 49 C.F.R. § 395.3.

[97]  Ex. 16, Hallmark's Fourth Supplemental Responses to Interrogatories; Ex. 17, Johnson's Fourth Supplemental Responses to Interrogatories; Ex. 18, Jowers's Fourth Supplemental Responses to Interrogatories; Ex. 19, Lilly's Fourth Supplemental Responses to Interrogatories; Ex. 20, McGee's Fourth Supplemental Responses to Interrogatories; Ex. 21, Miller's Fourth Supplemental Responses to

For instance, the Plaintiffs allege that Jowers was shorted approximately $701 per week on average in pay.[98] On the other hand, the Plaintiffs allege that Hallmark was paid, on average, only $250 per week below minimum wage.[99] Then in the middle is someone like Miller, whose alleged average weekly damages is $530.[100]

When two Plaintiffs (Jowers and Hallmark, for example) were under contract with KLLM during the same period,[101] yet are alleging vastly different amounts of net revenue or conversely average weekly damages, the only differences that could possibly account for the disparity is the individual decision-making of each respective Plaintiff which in the totality of the circumstances either supports or undermines each one's classification as a contractor.  It also highlights the right of KLLM to defend these claims individually as addressed later in Section C.

If these results and damages were only driven by a policy or practice of KLLM that determined each Plaintiffs' opportunity for profit or loss then a more uniform result would be expected. All of the minute decisions each contractor makes each day, under the "totality of the circumstances" analysis used by the Fifth Circuit,[102] shows that these decisions impact the amount of damages – and, therefore, the amount of profit – experienced by each individual Plaintiff.

While this testimony indicates varying considerations each contractor took into account, Viscelli asserts in his report that "[i]t is unlikely that decisions [that would include: what route to take; where to stop for fuel; where to get maintenance done; and, what loads to haul would] result

---

Interrogatories; Ex. 22, Shettles's Fourth Supplemental Responses to Interrogatories; Ex. 23, Tillman's Fourth Supplemental Responses to Interrogatories.
[98] Ex. 18, Jowers Fourth Supplemental Responses to Interrogatories.
[99] Ex. 16, Hallmark Fourth Supplemental Responses to Interrogatories. This claim is baffling considering Hallmark averaged $1,330 a week, which is $112 more than a minimum wage claim of $1,218 due for 24/7 hours working under Plaintiffs' theory.
[100] Ex. 17, Johnson Fourth Supplemental Responses to Interrogatories.
[101] Ex. 1, Beard Decl. at ¶ 5.
[102] *See, e.g., Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042 (5th Cir. 1987).

in any meaningful difference among the drivers." [103] Obviously, he did not look at the damages evidence or the settlement statements because this analysis runs contrary to the evidence the Court will be required to evaluate. Jowers would likely consider his results meaningfully different from Johnson's, Lilly's or Hallmark's results. In short, the evidence shows that each Plaintiff's freedom to make individual decisions, not KLLM policy, impacted gross revenue and average weekly net revenue along with claimed damages as there is a significant difference in the results each Named and Opt-In Plaintiff obtained.

The Court would need to weigh each Plaintiffs' methodologies, results and claimed damages along with how each testified KLLM provided opportunity for profits, or interfered with that opportunity, to determine how it impacts each individual contractor and his classification. This certainly could not be done on a collective basis.

4. *The permanency of the Plaintiffs' relationship with KLLM spans one month to four years such that they are not "similarly situated."*

While the ICA signed by each Plaintiff states the contractual relationship with KLLM is to be for a one-year term, the ICA is renewable each year for an additional year at the election of the Plaintiff. [104] This causes the amount of time each Plaintiff remained under contract with KLLM in total to vary greatly. For instance, Tillman chose to stay under contract with KLLM for less than the one-year period stated in the ICA, and decided to terminate his ICA after only 34 days; Hallmark opted to stay under contract with KLLM for over four years (1,531 days).[105]

In *Christianson*, Plaintiffs worked for the Defendant for periods of time ranging from nine months to five years.[106] Some of the *Christianson* Plaintiffs "worked only for a few days at a time

---

[103] ECF Doc. 195-24 at ECF p. 27 (report p. 26).
[104] *See, e.g.,* Shettles's ICA ¶ 7 (Docket 195-14 at p. 74)(ICA renews annually on anniversary date).
[105] Ex. 1, Beard Decl. at ¶ 5.
[106] *Christianson v. NewPark Drilling Fluids, LLC,* 2015 WL 1268259 (S.D. Tex. 2015).

with extended periods of time during which they performed no work for the Defendant. Others worked lengthy periods of time with short breaks in service."[107] Here the amount of time each Plaintiff opted to stay out on the road to generate a profit versus optional off-time spent at home varied. One Plaintiff stated his usual routine was to be on the road for two weeks and to come home for two days; another testified he would stay our four weeks and come home for two days; another testified he would stay out six weeks and come home for three days; and yet another testified his days out and days home were random and varied. All testified the amount of home time to take was up to them.[108]

In *Christianson*, these similar facts were determined to demonstrate "that the analysis of [the permanency of the relationship] factor is highly individualized" and required the litigation not move forward as a class.[109] Accordingly, the Plaintiffs cannot be similarly situated as it relates to the permanency of the relationship between each contractor and KLLM.

### C.  The Plaintiffs have not shown KLLM had a uniform policy of paying less than minimum wage.

KLLM's compensation method of paying by the mile and allowing deduction of business expenses does not violate the FLSA.  Rather, the FLSA is only violated if the total gross compensation, minus the business expenses, divided by the number of hours worked, is less than $7.25.[110]  Each contractor must make this individual showing for each week they were under contract with KLLM for which they claim wages were not properly paid.[111]

---

[107] *Christianson, LLC,* 2015 WL 1268259 at *4.
[108] *See, e.g.*, Ex. 8, Hallmark Depo. at pp. 58-9; Ex. 9, Johnson Depo. at p. 65; Ex. 10, Jowers Depo. at pp. 52-3; Ex. 11, Lilly Depo. at pp. 41-4; Ex. 12, McGee Depo. at pp. 102-7; Ex. 13, Miller Depo. at pp. 110-1; Ex. 14, Shettles Depo. at p. 144; Ex. 15, Tillman Depo. at p. 96.
[109] *Christianson, LLC,* 2015 WL 1268259 at *4.
[110] 29 U.S.C. § 206; *Taylor,* 2013 WL 943531, at *7.
[111] *Id.*

1. *The week-by-week individualized damages claimed by each Plaintiff varies significantly, necessitating individualized defenses by KLLM because the Plaintiffs are not "similarly situated."*

In the Plaintiffs' Fourth Supplemental Responses to Interrogatories, each Plaintiff gave three important – and different – sets of data in response to Interrogatory No. 2. Each Plaintiff gave a total aggregate of alleged damages for the entirety of their respective contract period asserting that each Plaintiff was entitled to pay 24 hours a day, seven days a week while on the road; a weekly "average" of damages to be used for weeks where records were allegedly incomplete or unclear; and a week-by-week breakdown of hours worked and alleged damages owed where records were available.[112]

It is to be expected that the total aggregate damages alleged by each Plaintiff will vary considering the permanency of each Plaintiff's relationship with KLLM varied so greatly, but the vast disparity in alleged weekly "average damages" and actual weekly damages shows that the damages claimed by each Plaintiff on a per-week basis, and the corresponding defenses to those damages, will differ greatly as well.[113] There is no methodology across the absent Opt-In Contractor class that can be applied to calculate each individual's damages.  A review of the eight Plaintiffs before this Court shows that the alleged weekly average damages range from $250 per week claimed by Hallmark to $701 per week claimed by Jowers.[114] This is approximately a 280% variance.  The average number of hours worked also varied from 134 hours to 168 hours on average per Plaintiffs' sworn Interrogatory responses.

---

[112] *See, e.g.,* Ex. 18, Jowers's Fourth Supplemental Responses to Interrogatories. All Plaintiffs' responses are found at Exhibits 16-23 and all are formatted identically.

[113] The average is generally based on damages calculated over periods when Plaintiff had both their settlement statements and their log books which allowed adjustments in hours claimed based on home time or other variations identified by each Plaintiff.

[114] Ex. 16, Hallmark's Fourth Supplemental Responses to Interrogatories; Ex. 18, Jowers's Fourth Supplemental Responses to Interrogatories.  The weeks where records were available to show actual hours claimed results in even more diverse week-by-week damage claims per Plaintiff.

If there were a common policy, plan or practice then the claims across the Plaintiffs should show consistent claims of underpayment.  Instead, in the week-by-week breakdown provided by each Plaintiff, there are some weeks where there was no shortfall and Plaintiff is alleging $0.00 damages. KLLM has summarized Plaintiffs' Interrogatory No. 2 response into some statistics at Exhibit 4.  A review of the summary shows that using the 24/7 damage numbers for McGee, no damages were claimed for approximately 6% of the total weeks McGee was under contract with KLLM.[115] But for Johnson, no damages were claimed 41% of the time.[116] The variance shown in Exhibit 4 does not support the claim of a common policy, plan or practice, to underpay Plaintiffs and the absent Opt-In Contractors, rather it supports individualized damage models not suited for class analysis.

The Plaintiffs have acknowledged there is a question as to whether Plaintiffs are entitled to wages for hours sleeping, and if they are not, then Plaintiffs intend to claim compensation for 16 hours out of each 24 hour period away from home. [117] The summary of Plaintiffs' sworn Interrogatory answers (Exhibit 4) regarding damages, adjusted for this 16/7 model, disproportionately increases the number of weeks where each Plaintiff was paid minimum wage. Under the 16/7 model McGee would now have approximately 81% of his work weeks in which he was paid properly.[118] Johnson would now show that in 58% of his work weeks he would not be entitled to damages.[119] A review of the Summary of Interrogatory No. 2, appended as Exhibit 4,

---

[115] Ex. 4, Inter. No. 2 Summary; Ex. 20, McGee's 4th Supp. to Interrogatory No. 2.

[116] Ex. 4, Inter. No. 2 Summary; Ex. 17, Johnson's 4th Supp. to Interrogatory No. 2.

[117] *Id.* This alternative would presumably come into play if a jury were to conclude that each Plaintiff had an express or implied agreement with KLLM stating they were not entitled to pay when sleeping. 29 C.F.R. 785.22(a); *see also* USDOL Field Operations Handbook § 30c10(b). Of course, this alone is an individual contractual analysis by the jury required as to each Plaintiff, notwithstanding their self-serving affidavits.  KLLM will assert the ICA is clearly intended to pay by mileage and that no compensation would be due for sleep time.

[118] Ex. 4, Inter. No. 2 Summary; Ex. 20, McGee's 4th Supp. to Interrogatory No. 2.

[119] Ex. 4, Inter. No. 2 Summary; Ex. 17, Johnson's 4th Supp. to Interrogatory No. 2.

shows varied claims among the other Plaintiffs that could not have resulted from a common policy, plan or practice and such varied claims are not suited to a class wide analysis.  Further, the fact that for some Plaintiffs there will be periods where there are no weekly damages under the FLSA is an individualized defense available to KLLM which necessitates declining to conditionally certify the class.[120]

2.  *The net amount paid on contractors' settlements shows they are not "similarly situated" because week-by-week elective deductions and advances are personal to each.*

Plaintiffs bear the burden of showing that they and the putative class members are similarly situated with respect to an *unlawful decision, policy or plan.*[121] Simply alleging the Plaintiffs and the putative absent Opt-In Contractors were subject to the same policies is not enough.  Rather, the policies must be unlawful.[122]  Here, the method by which deductions are made via settlement statement may be uniform, but the type, voluntariness, and frequency of the deductions themselves vary widely depending on each Plaintiff's choices, not KLLM's decision, policy or plan.

Each Plaintiff opted to make various optional deductions from their net settlements each week. The types of optional deductions available include: legal plan, disability insurance, critical illness insurance, accident insurance, dental insurance, individual life insurance, group life insurance, child life insurance, and spousal life insurance.[123]  Some also took advances on compensation and others were subject to garnishments that lowered their net pay, but those

---

[120] *See, Camesi v University of Pittsburgh Medical Center,* 2011 WL 6372873, at *9 (W.D. Pa. 2011)(decertifying the conditionally-certified FLSA class in light of defendant's individualized defenses which included "whether individual plaintiffs actually worked [compensable time under the FLSA].").
[121] *Eagle v. Freeport-McMoran, Inc.,* 2016 WL 7494278, at *6 (D.N.M. Aug. 3, 2016)(denying conditional certification where policy or plan denying overtime was not shown).
[122] *Id.*
[123] Ex. 1, Beard Decl. at ¶ 30.

deductions do not lower their per hour wage rate. [124] Of all eight Plaintiffs, no two opted for an identical set of optional deductions. [125]

Further, there is no correlation between the number and amount of optional deductions and the weekly "averages" alleged by each Plaintiff making a standard class-wide adjustment unworkable. The Plaintiff with the most optional deductions (10 of 10), was actually the Plaintiff, with the lowest alleged weekly damages, Opt-In Plaintiff Hallmark. [126] Meanwhile, Opt-In Plaintiff Miller had the fewest optional deductions (2 of 10), but the second-highest alleged weekly damages. [127] Even within the settlement statements of a particular Plaintiff, the number of optional deductions each took over time varies, with some adding or dropping optional deductions at various times, and the same will be true of the absent Opt-In Contractors. [128]

Advances further differentiate Plaintiffs from each other and the absent Opt-In Contractors. KLLM will provide, upon request, a personal advance on compensation to a contractor up to $300 per week. [129] KLLM also provides optional advances for anticipated expenses, such as loaders or washouts. [130] Like voluntary deductions discussed above, an advance does not reduce wages for FLSA purposes, and the advance deduction must be added back to the settlement statement net figure to determine actual net revenue in any given week before calculating the hourly rate. [131] The number and frequency of advances taken by each Plaintiff, and by each member of the absent Opt-

---

[124] Ex. 1, Beard Decl. at ¶¶ 28-31.
[125] Id. at ¶¶ 32-39.
[126] Ex. 1, Beard Decl. at ¶ 36; Ex. 16, Hallmark Fourth Supplemental Responses to Interrogatories.
[127] Ex. 1, Beard Decl. at ¶ 38; Ex. 21, Miller Fourth Supplemental Responses to Interrogatories.
[128] Ex. 1, Beard Decl. at ¶ 39.
[129] *Id.* at ¶ 29.
[130] *Id.*
[131] *Adamson v. W.R. Coleman Excavation, LLC,* 2017 WL 4180008, at *4 (D. Utah 2017). "[W]here an employer makes a loan or an advance of wages to an employee, the principal may be deducted from the employee's earnings even if such deduction cuts into the minimum wage or overtime pay due the employee under the FLSA." *Wage and Hour Opinion Letter of Mar. 20, 1998,* 1998 WL 852662; *See also,* U.S. DOL, Wage & Hour Division Field Operations Handbook § 30c10(b)(available at https://www.dol.gov/whd/FOH/index.htm).

In Contractors, varies and requires an individualized weekly analysis in order for Plaintiffs' to prove, and for KLLM to defend, the issue of liability per week.

3.   *The lack of records will shift the burden to KLLM to defend the varying hours claimed.*

Evidence will show that no two contractors worked the same schedule.  The days and hours worked per week vary from Plaintiff to Plaintiff and will vary the same way among the absent Opt-In Contractors.  In Plaintiffs' damage calculations the per week variances are clear.  The number of times each Plaintiff was required to use his weekly "average" in spots where the Plaintiffs allege incomplete records varies substantially in frequency as well.[132]  The 'missing' record is the hours of service records which show each Plaintiffs' off-duty, on-duty, driving and sleeper berth time minute-by-minute for each full day.[133]  Plaintiffs were required to keep these records of duty status daily and to verify their accuracy.[134]  Due to KLLM's six-month retention policy, many of these records were not available for Plaintiffs and may not be available for the absent Opt-In Contractors.

Each Plaintiff, in his respective Fourth Supplemental Responses to Interrogatories, states, "[w]here complete data sets have not been kept or provided by Defendant, [the Plaintiff] has applied his own average weekly hours and earnings to fill the gaps in data left by Defendant's failure to keep complete and accurate records."[135]

Once a putative employee has shown work hours for which he was not compensated, and "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable

---

[132] For instance, Tillman is not required to use his weekly average at all; the Plaintiffs used weekly averages for Hallmark in 50% of the 158 total weeks he was under contract during the liability period because of a lack of hours of service records. Ex. 4, Inter. No. 2 Summary.
[133] 49 C.F.R. Part 395.
[134] *Id.*; Ex. 1, Beard Decl. at ¶ 55.
[135] Ex. 18, Jowers's Fourth Supplemental Responses to Interrogatories (identical to other Plaintiffs).

inference," the burden is on the employer to provide evidence to rebut that inference.[136]   KLLM will be required to show each Plaintiff was paid minimum wage for work hours week-by-week in those weeks without hours of service records.

To proceed as a collective action without permitting KLLM "to raise at the liability stage of trial each and every defense…particular to each such plaintiff would deprive [KLLM] of the Fifth Amendment right to due process."[137] Because of the sporadic and differing nature of pay from each of the eight Plaintiffs, "[i]f liability is found, damages would necessarily require a case-by-case inquiry, thereby rendering it impossible to try this case as a collective class."[138] The Court should not then "simply ignore the fact that certain individualized defenses might apply and postpone the issue until decertification."[139] Like in *Andel*:

> "[E]ven among the four named Plaintiffs, the number of hours worked each week varied significantly; the number of hours worked each day varied significantly; the pattern of days on and days off of work varied significantly; the pattern of invoice submission varied significantly; the length of time each Plaintiff worked for [the Defendant] varied significantly…each Plaintiff's relative investments and ability to control his opportunities for profit and loss also varied significantly, including how much he spent on equipment and supplies, whether or not he purchased general liability insurance, and whether or not he paid an assistant[.]"[140]

The same facts listed in the *Andel* case where the Plaintiffs were shown not to be similarly situated, exist in this case and each significantly impacts Plaintiffs' weekly damage calculations, how much they made each week and how often they were home.

---

[136] *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  Among the eight Plaintiffs, one has a complete set of records.  The remaining seven all have at least portions of their records that are incomplete and will require analysis of each individual weekly claim.

[137] *Lusardi v. Xerox Corp.*, 188 F.R.D. 351, 370 (D.N.J. 1987).

[138] *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005).

[139] *Clay v. Huntington Ingalls, Inc.*, 2012 WL 860375, at * 8 (E.D. La. 2012) (*quoting Shushan v. Univ. of Colorado at Boulder*, 132 F.R.D. 263 (D. Colo. 1990).

[140] *Andel*, 280 F.R.D. at 295-6 (from magistrate's recommendation adopted by district court denying conditional certification).

The central meaning behind due process is simple: "parties whose rights are to be affected are entitled to be heard."[141] KLLM has the right to be heard by the jury in its defenses to damages for each individual week for each individual Plaintiff and each absent Opt-In Contractor were the instant case to be conditionally certified. The issues of damages would then require a case-by-case inquiry, which renders it "impossible to try [the case] as a collective class."[142]

### D. Fairness and procedural concerns necessitate declining to conditionally certify the class.

When determining whether to allow a class to proceed collectively, "coherent management of the trial and avoidance of jury confusion are essential considerations."[143] This is because "a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. *It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability."*[144] Plaintiffs' own Interrogatory responses show weekly analysis is not only necessary but the only way to create their damage model. Clearly, they plan to refine it further based on the qualification in each Interrogatory response. Thus, the need for individual analysis "eviscerates all notions of judicial economy that would otherwise be served by conditional class certification."[145]

"Disparate individual defenses heighten the individuality of claims, and requiring the defendant to raise these arguments in a [collective] action suit undermines its ability to mount a clear and coherent defense to the case."[146] Forcing KLLM to proceed against the putative class

---

[141] *Baldwin v. Hale*, 68 U.S. 223, 233 (1863).

[142] *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 511 (M.D. La. 2005).

[143] *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 936 (E.D. Ark. 2012).

[144] *Gatewood v. Koch Foods of Mississippi, LLC,* 2009 WL 8642001 at *20 (S.D. Miss. 2009)(emphasis added).

[145] *Demauro v. Limo, Inc.,* 2011 WL 9191 at *4 (M.D. Fla. 2011).

[146] *King v. West Corp.*, 2006 WL 1189577 at *15 (D.Neb. 2006).

would "unfairly and prejudicially require [KLLM] to prepare for and present hundreds of different trials simultaneously."[147]

Conditionally certifying the class despite evidence of individualized factual settings and defenses of each Plaintiff would only serve to subject KLLM to potentially hundreds of thousands of dollars in unnecessary discovery costs. "To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for same prior to its certification would be an exercise in futility and wasted resources for all parties involved."[148] In considering fairness and procedural considerations, if there is "no benefit to the court or to the parties in attempting to litigate collectively," proceeding as a class is improper.[149]

### E. Alternatively, if conditionally certified, the class should be limited in both time and scope.

Plaintiffs have asked the conditional class against KLLM be defined as "all individual persons and/or entities who entered into Independent Contractor Agreements and Tractor Lease/Purchase Agreements with KLLM Transport Services, LLC."[150] The Plaintiffs do not set any date ranges or similar limitations on the definition of the putative class.

### 1. The class should extend back only three years from the date of the order granting conditional certification.

The FLSA imposes a two-year statute of limitations, which is extended to three years for willful violations of the statute.[151] The FLSA further provides that an action commences for purposes of this statute of limitations when a claimant who is not named as a party plaintiff in the complaint files written consent with the court where the action was commenced.[152] "[C]ourts

---

[147] *Douglas*, 888 F. Supp. 2d at 936; *Prizmic v. Armour, Inc.*, 2006 WL 1662614 at *2 (E.D.N.Y. 2006)(Defendant unduly burdened by frivolous fishing expedition).
[148] *Basco*, 2004 WL 1497709 at *5 (E.D. La. 2004).
[149] *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1104 (9th Cir. 2018).
[150] Ex. 32, Plaintiffs' Proposed Order on Plaintiffs' Motion for Conditional Certification.
[151] 29 U.S.C.A. § 255 (1947).
[152] 29 U.S.C.A. § 256(b).

within the Fifth Circuit have repeatedly recognized that based on the statute of limitations, class certification is appropriately limited to workers employed by the defendant up to three years before notice is *approved* by the court."[153]

As such, "the three-year period under the FLSA should be measured from the date [conditional certification is granted], rather than the date Plaintiffs' Complaint was filed."[154] Moreover, *"[the Plaintiffs] never filed a motion seeking to toll the running of the applicable statute of limitations,* and therefore, the appropriate time period should be three years back from the date this Court conditionally certifies the putative class."[155]

2.   *The class should exclude those contractors who first signed an ICA on or after September 25, 2017.*

In KLLM's Responses to Interrogatories noticed June 13, 2018 at Docket 81, KLLM stated, "[A]fter September 25, 2017, certain of those independent contractors have waived their rights to join a collective action[.]"[156] The ICA and LPA revised as of September 25, 2017, were also produced in discovery at KLLM 6640-9987 with KLLM's Responses to Plaintiffs' Requests for Production.[157]

The ICA and LPA revised as of September 25, 2017, contain enforceable class waiver and arbitration provisions, correcting deficiencies the Court found in the earlier class waivers signed

---

[153] *Perez v. City of New Orleans*, 2015 WL 4547505 at *3 (E.D. La. 2015)(internal quotations omitted)(emphasis in original); *see also, Tolentino v. C & J Spec-Rent Servs., Inc.,* 716 F. Supp. 2d 642, 654 (S.D. Tex. 2010)(*quoting Quintanilla v. A & R Demolitina, Inc.,* 2005 WL 2095104 at *16)(S.D. Tex. 2005)); *Watson v. Travis Software Corp.,* 2008 WL 5068806 at *9 (S.D. Tex. 2008)("A class period covering the three years before the date this court approves conditional certification and notice is appropriate in this case.").

[154] *Sandoval v. Carrco Painting Contractors,* 2016 WL 8674067 at *5 (W.D. Tex. 2016).

[155] *Lemmers v. Gary Pools, Inc.,* 2016 WL 7508075 at *3 (W.D. Tex. 2016).  KLLM does not concede the three-year statute of limitations applies as that decision would be made later on the merits.  Rather, it is only speaking in terms of the time period governing the initial make-up of the conditional class.

[156] Ex. 5, KLLM's Responses to Interrogatories.

[157] Ex. 6, KLLM's Responses to Requests for Production; Ex. 33, Independent Contractor Agreement rev. September 25, 2017; Ex. 34, Lease Purchase Agreement rev. September 25, 2017.

by these Plaintiffs.[158] Any contractor who entered into a new ICA or LPA with KLLM on or after September 25, 2017, is contractually prohibited from joining a collective action. Including those contractors would only serve to provide a ready-made list of potential new clients to Plaintiffs' counsel rather than notifying eligible parties of their right to join the class.[159] Further, the definition suggested by the Plaintiffs does not contain any time period limitation.

Accordingly, if the Court were to grant conditional certification, the scope of the putative class should be restricted to "those individual persons who executed a Tractor Lease/Purchase Agreement with KLLM Transport Services, LLC and who operated under an Independent Contractor Agreement with KLLM Transport Services, LLC at any time on or after [insert date 3 years prior to date of order of conditional certification], but excluding any <u>new</u> individual persons who executed an Independent Contractor Agreement or Lease Purchase Agreement with KLLM Transport Services, LLC for the first time on or after September 25, 2017."

### F.  If conditionally certified, then Plaintiffs are only entitled to mailing address.

KLLM objects to the provision of the phone number, e-mail addresses or social security numbers of each putative Opt-In Contractor as such is private and personal information. Plaintiffs have not demonstrated a need for such information at this stage.  "At the conditional certification stage, discovery of the names and addresses of potential class members is appropriate."[160] "However, [Plaintiff] has not demonstrated any need for the additional

---

[158] *Epic Systems Corp. v. Lewis,* 138 S. Ct. 1612 (2018).

[159] This concern has been identified in pre-certification discovery but should apply equally here where there is a clear class waiver in place after that date.  *Dziennik v. Sealift, Inc.,* 2006 WL 1455464, at *1.

[160] *Santinac v. Worldwide Labor Support of Illinois, Inc.*, 107 F. Supp. 3d 610, 617 (S.D. Miss. 2015)(*citing Lopez v. Bombay Pizza Co.*, No. H–11–4217, 2012 WL 5397192, at *3 (S.D. Tex. Nov. 5, 2012)(citations omitted)).

information at this stage of this case."[161] Courts have also found compelled disclosure of this information inappropriate based on the privacy concerns of the potential class members.[162]

In *Arceo v. Orta*[163] the court declined to require e-mail addresses or telephone numbers because it was highly personal information "about persons who may in fact have no interest in this litigation [and] should not be disclosed on the thin basis that [plaintiff's] counsel desires it." The court further concluded there was no apparent reason to conclude sending a letter was inadequate.[164]

Further, the provision of the social security numbers would be a breach of privacy for which no justification has been provided by Plaintiffs.  Even after the mail is returned undeliverable, less intrusive efforts should be made before such sensitive information is provided regarding a non-party to this matter.[165]  The mailing of notice should be more than adequate in this matter since there is no showing that such method would be inadequate.[166]

Ultimately, the parties have already agreed on a procedure.  This Court should adopt the procedure agreed upon by the parties in the Case Management Order (CMO) at Docket 67, p. 8 stating the parties must confer first and then ask the court to intervene if necessary.

---

[161] *Id.*

[162] *Id.*; *see, e.g., Nguyen v. Versacom, LLC*, 2015 WL 1400564, at *3 (N.D. Tex. Mar. 27, 2015).

[163] 296 F. Supp. 3d 818, 827 (N.D. Tex. 2017)(citing *Humphries v. Stream Inter., Inc.,* No. 3:03-CV-1682-D (N.D. Tex. Feb. 13, 2004)).

[164] *Id.*

[165] *In re Wells Fargo Wage & Hour Emp't Practices Litig. (No. III),* No. H–11–2266, 2013 WL 2180014, at *3 (S.D. Tex. May 17, 2013)(allowing social security numbers but only after return of mail and other less intrusive means exhausted).

[166] *Nguyen v. Versacom, LLC*, 2015 WL 1400564, *13 (N.D. Tex. Mar. 27, 2015) (finding need for disclosure was outweighed by privacy interests where "there [was] no apparent reason to conclude that sending a letter to a person's last known address [would] be inadequate"); *Rosario v. Valentine Ave. Discount Store, Co., Inc.,* 828 F. Supp. 2d 508, 522 (E.D.N.Y. 2011) (declining to order production of dates of birth and social security numbers).

## IV. CONCLUSION

Conditional certification should be denied and the Court is directed to KLLM's Response

to Plaintiffs' Motion for Conditional Certification for additional specific relief requested.

THIS the 18th day of January, 2019.

Respectfully submitted,

**KLLM TRANSPORT SERVICES, LLC**

By Its Attorneys,

DunbarMonroe, PLLC

*s/ Clark Monroe*
Clark Monroe

OF COUNSEL:

Clark Monroe (MS Bar# 9810)
Email: gcmonroe@dunbarmonroe.com
Christopher Dunnells (MS Bar# 105029)
Email: cdunnells@dunbarmonroe.com
*DunbarMonroe, PLLC*
270 Trace Colony Park, Suite A
Ridgeland, Mississippi  39157
Office: (601) 898-2073
Facsimile: (601) 898-2074